**2023-1073**

# United States Court of Appeals for the Federal Circuit

SAVVY DOG SYSTEMS, LLC, POM OF PENNSYLVANIA, LLC,

*Plaintiffs-Appellants,*

– v. –

PENNSYLVANIA COIN, LLC, PA COIN HOLDINGS, LLC,

*Defendants-Appellees.*

*Appeal from the United States District Court for the Middle District of Pennsylvania in No. 3:19-CV-01470-JPW Honorable Jennifer P. Wilson*

## BRIEF FOR PLAINTIFFS-APPELLANTS

STEVEN G. HILL
DAVID K. LUDWIG
HILL, KERTSCHER & WHARTON LLP
3625 Cumberland Boulevard, SE, Suite 1050
Atlanta, Georgia  30339
(770) 953-0995
sgh@hkw-law.com
dludwig@hkw-law.com

*Counsel for Appellants*

JANUARY 4, 2023

COUNSEL PRESS, LLC                                                    (888) 277-3259

## CLAIM 44 OF U.S. PATENT NO. 7,736,223

44. An electronic gaming system comprising:

an electronic game terminal including a touch screen display;

a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:

constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

determining if the player has decided to play the displayed game; and

displaying an outcome resulting from play of the displayed game.

i

# CERTIFICATE OF INTEREST

Counsel for Appellants Savvy Dog Systems, LLC and POM of

Pennsylvania, LLC certifies the following:

1.   The full name of every party I represent is:  Savvy Dog Systems, LLC and POM of Pennsylvania, LLC

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) I represent is:  N/A

3.   All parent corporations and any publicly held companies that own 10% or more of the stock of the party I represent are:  N/A

4.   The names of all law firms and the partners and associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear for the party in this court (and who have not or will not enter an appearance in this case) are:

     **Hill, Kertscher & Wharton, LLP:** John North, Martha Decker (no longer with the firm)

     **Kleinbard LLC:** Matthew Haverstick, Eric J. Schreiner, Paul Gagne, Shohin Vance, James Gorman III

5.   The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal are as follows:

     *Savvy Dog Systems, LLC v. Pennsylvania Coin, LLC*, No 5:21-mc-00021-BM (E.D.N.C.)

6.   All information required by Federal Rule of Appellate Procedure 26.1(b) and (c):  N/A


Dated:  January 4, 2022                                          */s/ Steven G. Hill*
                                                                Steven G. Hil

ii

# TABLE OF CONTENTS

**Page**

CLAIM 44 OF U.S. PATENT NO. 7,736,223 .................................................i

CERTIFICATE OF INTEREST ..................................................... ii

TABLE OF AUTHORITIES ...........................................................v

STATEMENT OF RELATED CASES ...........................................1

JURISDICTIONAL STATEMENT .................................................1

STATEMENT OF ISSUES ..............................................................1

STATEMENT OF THE CASE............................................................2

    I.     STATEMENT OF THE FACTS...........................................2

         A.     Field of Invention:  Electronic Gaming ......................3

         B.     Patented Technology..................................................6

             1.    The Claims.......................................................6

             2.    The Disclosed Invention ....................................8

    II.    PROCEDURAL HISTORY ..............................................13

         A.     Orders on the Motion to Dismiss and Related Motion for Summary Judgment of Patent Invalidity...........................13

         B.     Claim Construction Order and Stipulated Partial Judgment ...........................15

         C.     Final Judgment and Notice of Appeal ....................16

SUMMARY OF THE ARGUMENT ........................................16

ARGUMENT ........................................................................18

    I.     STANDARD OF REVIEW .............................................18

         A.     Summary Judgment .................................................18

         B.     Patent Eligibility ....................................................19

         C.     Claim Construction .................................................20

    II.    PATENT ELIGIBLITY UNDER 35 U.S.C. § 101..........................21

A.      Step One—The 223 Patent Claims Are Directed to an Inventive Electronic Gaming System, not Merely "Rules for Playing a Game"......................................................21

B.      Step Two—The 223 Patent Claims Recite Significantly More than "Rules for Playing a Game" ....................................32

III.    CONSTRUCTION OF "AN ACTUAL GAME TO BE PLAYED" ........................................................................................40

A.      Only Appellees' Proposed Construction Accords with the Plain Meaning of the Claim Language ..............................41

B.      The District Court's Adopted Construction Improperly Excludes Preferred Embodiments...............................................44

C.      There Is No Lexicography or Disclaimer in the Intrinsic Evidence Supporting the District Court's Adopted Construction ............................................................47

CONCLUSION...................................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*3M Innovative Props. Co. v. Tredegar Corp.*,
　725 F.3d 1315 (Fed. Cir. 2013) ....................................................49

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
　573 U.S. 208 (2014)................................................... *passim*

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
　314 F.3d 1313 (Fed. Cir. 2003) ....................................................50

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986).................................................... 18-19

*BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*,
　827 F.3d 1341 (Fed. Cir. 2016) .......................................... 20, 35-36

*Berkheimer v. HP Inc.*,
　881 F.3d 1360 (Fed. Cir. 2018) ..................................... 19, 32, 33, 35

*Bilski v. Kappos*,
　561 U.S. 593 (2010)....................................................31

*Bowers v. Baystate Techs. Inc.*,
　320 F.3d 1317 (Fed. Cir. 2003) ....................................................46

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
　749 F.3d 1349 (Fed. Cir. 2014) ....................................................51

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*,
　880 F.3d 1356 (Fed. Cir. 2018) .......................................... 32, 44

*CosmoKey Solutions GmbH & Co. KG v. Duo Security LLC*,
　15 F.4th 1091 (Fed. Cir. 2021) .......................................... 33, 34

*Data Engine Techs. LLC v. Google LLC*,
　906 F.3d 999 (Fed. Cir. 2018) ................................................ *passim*

*DDR Holdings, LLC v. Hotels.com, L.P.*,
　773 F.3d 1245 (Fed. Cir. 2014) ................................................ *passim*

*Dealertrack, Inc. v. Huber*,
　674 F.3d 1315 (Fed. Cir. 2012) ....................................................51

*EcoServices, LLC v. Certified Aviation Services, LLC*,
    830 F. App'x 634 (Fed. Cir. 2020) .................................................................31

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) ..................................................... 20, 27, 29

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018) ..................................................................22

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
    750 F.3d 1304 (Fed. Cir. 2014) ..................................................................50

*Hakim v. Cannon Avent Grp., PLC*,
    479 F.3d 1313 (Fed. Cir. 2007) ..................................................................50

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,
    977 F.3d 1212 (Fed. Cir. 2020) ..................................................................44

*In re Smith*,
    815 F.3d 816 (Fed. Cir. 2016) ............................................................ *passim*

*Inline Plastics Corp. v. EasyPak, LLC*,
    799 F.3d 1364 (Fed. Cir. 2015) ........................................................... 44, 49

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) .......................................................... *passim*

*Microsoft Corp. v. i4i Ltd. P'ship*,
    564 U.S. 91 (2011).......................................................................................19

*Nat. Alts. Int'l, Inc. v. Creative Compounds, LLC*,
    918 F.3d 1338 (Fed. Cir. 2019) ..................................................................19

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,
    903 F.3d 1365 (Fed. Cir. 2018), *as amended* (Sept. 20, 2018) ....................44

*Nystrom v. TREX Co.*,
    424 F.3d 1136 (Fed. Cir. 2005) ..................................................................18

*Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008) ..................................................................39

*Packet Intelligence LLC v. NetScout Systems, Inc.*,
    965 F.3d 1299 (Fed. Cir. 2020) ..................................................................22

*Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005) ........................................................... 50, 51

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ............................................ 41, 42

*Planet Bingo, LLC v. VKGS LLC*,
   576 F. App'x 1005 (Fed. Cir. 2014) ...........................................30

*RaceTech, LLC v. Kentucky Downs, LLC*,
   167 F. Supp. 3d 853 (W.D. Ky. 2016) ........................................34

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
   827 F.3d 1042 (Fed. Cir. 2016) ................................................21

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015).......................................................... 20, 21

*Thales Visionix Inc. v. United States*,
   850 F.3d 1343 (Fed. Cir. 2017) ................................................22

*Thorner v. Sony Computer Ent. Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ............................................ 42, 47

*Toshiba Corp. v. Imation Corp.*,
   681 F.3d 1358 (Fed. Cir. 2012) ................................................51

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(1)................................................................1

28 U.S.C. § 1331 .......................................................................1

28 U.S.C. § 1338(a) ...................................................................1

35 U.S.C. § 101 .................................................................. *passim*

35 U.S.C. § 271 .......................................................................13

35 U.S.C. § 282 .......................................................................19

Federal Circuit Rule 28(a)(4).......................................................1

Federal Circuit Rule 47.5 ...........................................................1

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rules 28(a)(4) and 47.5, Appellants Savvy Dog Systems, LLC and POM of Pennsylvania, LLC (collectively "Appellants") state:

(a)    No other appeals in or from the same civil action or proceeding in the district court were previously before this or any other appellate court.

(b)    *Savvy Dog Systems, LLC et al v. Pennsylvania Coin, LLC et al*, Civil Action No. 5:21-mc-00021-BM, an action currently pending before the United States District Court for the Eastern District of North Carolina relating to the enforcement of a discovery subpoena against a third party, will be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

This appeal arises from a final decision of the United States District Court for the Middle District of Pennsylvania.  The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  The district court granted summary judgment to the Appellees and entered final judgment on September 19, 2022.  Appellant timely filed a notice of appealed on October 13, 2022.  This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1.    Whether the district court erred in holding that representative claim 44 of U.S. Patent No. 7,736,223 (the "223 Patent") is directed to the abstract idea of rules for playing a game under 35 U.S.C. § 101, despite the technological

1

improvement to touch screen electronic gaming terminal functionality embodied in that claim.

2.      Whether the district court erred in holding that the 223 Patent claims lack an inventive concept under 35 U.S.C. § 101, despite evidence that the 223 Patent's claimed game processor is specially-configured in a manner that gaming terminal engineers at the time of invention considered unconventional, novel, and counterintuitive.

3.      Whether the district court erred in construing "an actual game to be played" in claim 44 of the 223 Patent to mean "the constructed game field of the game to be played" rather than "the game to be played, including an otherwise unknown system-generated attribute of it," despite the adopted construction contradicting the plain meaning, excluding disclosed embodiments from the scope of the claims, and failing to be supported by lexicography or disclaimer in the intrinsic evidence.

**STATEMENT OF THE CASE**

**I.      STATEMENT OF THE FACTS**

Michael Pace, the inventor of the 223 Patent, designed the first gaming counter-top in 1980, the first truly interactive videodisc-based, coin-operated game in 1985, and the world's first electronic pull tab gaming system, called Pot of Gold, in 1990.  Appx0989.  In 1994, Pot-O-Gold was the first game terminal installed in

2

Foxwoods Casino in Connecticut. *Id.* In line with Pace's prior innovations, the 223 Patent relates to electronic gaming, and more specifically to electronic gaming that incorporates an element of skill. Appx0123-0142.

### A.   Field of Invention:  Electronic Gaming

By 1980, game engineers had developed various electronic gaming machines, including machines that play video poker, video blackjack, and video slots. Appx0986 (¶10). Many prior art games presented an array of game symbols on the screen for a user to see and further included multiple player input buttons, a bill acceptor, audio speakers, and a circuit board. Appx0990 (¶32). Problems encountered in the field of electronic gaming included the complexities of rendering video graphics that are lifelike, avoiding player boredom, managing ever-increasing numbers of game combinations, and administering payouts. *Id.*

Computer technology had advanced by the early 2000's due largely to the evolution of processor clock speed for instruction processing, reduction in memory limitations for game software implemented by game processors, and related graphics improvements. Appx0992-0993 (¶45). This enhanced flexibility in video design allowed game engineers to visibly show different numbers of symbols on the screen, such as 3x3, 3x5, and 4x5 matrices. Appx0994 (¶50). Game engineers also began to animate symbols, morph symbols, and to change symbols during the game. *Id.* Various electronic gaming machines in the 2006 timeframe involved

spinning reels and matching combinations of symbols.  Appx0997-0998 (¶¶60-61).

Other games playable on electronic gaming machines include video versions of

keno, poker, roulette, and blackjack.  Appx1189.

The use of computers to randomize the selection of symbols using random

number generators (RNGs) and RNG-related algorithms has historically been

foundational to casino gaming and other gambling machines.  Because players

cannot influence the operation of an RNG, the outcome of any of these prior art

games is largely determined by chance.  Appx0994-0995.

Amusement and entertainment type electronic games became very popular

in recent decades and, as their popularity has increased, several states legalized

certain types of gaming but under heavy regulation.  Appx0998.  Ohio, for

example, generally prohibits gambling and the use of any gambling devices, but

permits "skill games" in which skill predominates over chance.  *Id*.  In a skill-

based amusement machine, the outcome of play during the game must be

predominately controlled by the person playing the game and not by odds or

random chance controlled by the machine.  *Id*.

To address the need for skill-based gaming, Michael Pace originally created

a gaming terminal that played an electronic game called "Tic-Tac-Fruit" ("TTF").

This game, like tic-tac-toe, employed a video display showing a grid of nine spots

arranged in a three-by-three array.  Appx1485.  Once the player committed funds

4

to play the game, the symbols used to populate the grid were automatically generated, and the player would use skill to solve a puzzle by inserting a "Wild Symbol" at a single location on the grid. *Id.* In this prior art version of TTF, the game grid was automatically generated and tested for rules compliance <u>after</u> the player committed to play the game, not before. Appx1510-1511 (112:5-113:8). Pace's grid generation and testing scheme replaced the need for a traditional RNG, which law enforcement regarded as a talisman of a game of chance. Appx1536-1537 (69:21-70:23). In contrast to the 223 Patent, the prior art version of TTF did <u>not</u> preview the actual game to be played to the player before the player committed to play the game. Appx1509 (111:11-22). Pace-O-Matic, Inc. licensed the prior art TTF game to Ohio Skill Games for distribution in Ohio. Appx1484.

Emerging questions about the legality of the prior art TTF in Ohio—whether it truly elevated player skill above the role of chance—prompted Pace to redesign the game. Appx1743-1744 (¶40). Before the invention of the 223 Patent, there were no known electronic games in which the player could preview the outcome of the game before committing to playing that game. Appx1743-1744 (¶40). To game engineers, offering players a game preview feature is considered counterintuitive. Appx1745-1747 (¶43), Appx1827 (¶234).

**B.      Patented Technology**

**1.      The Claims**

The 223 Patent sets forth Michael Pace's "electronic gaming method and system with a game preview display." Appx0123.  The disclosed method and system for previewing the game before the player decides to play the game, and requiring a player-based selection of a field element for conversion to a wild symbol, lessens the level chance in an instance of game play and increases the impact of skill.  Appx0998-0999.

Representative claim 44 of the 223 Patent provides:

> **[44P]** An electronic gaming system comprising:
>
> **[44.1]** an electronic game terminal including a touch screen display;
>
> **[44.2]** a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:
>
> **[44.3]** constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;
>
> **[44.4]** determining at least one winning combination for each play of the game;
>
> **[44.5]** <u>testing</u> the game field <u>prior to displaying the game to the player</u> to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

**[44.6]** <u>automatically displaying an actual game to be played</u> on the touch screen game display to a player <u>prior to initiating activation of game play</u>;

**[44.7]** determining if the player has decided to play the displayed game; and

**[44.8]** displaying an outcome resulting from play of the displayed game.

Appx0140-0141 (16:47-17:2 (emphasis added)). *See also* Appx0051-0052 (parties agreed claim 44 is representative), Appx0106 (same). Note that in the claim, the "testing" of the grid in [44.5] precedes "automatically displaying an actual game to be played" in [44.6], which occurs "prior to initiating activation of game play." Displaying the game prior to instituting the game was not in the prior art TTF, so Claim 44 represents more than a mere change in the order of steps. Element [44.6] represents an entirely new step. Appx1829 (¶237b).

Elements [44.2], [44.5] and [44.6] describe a specially-configured electronic gaming processor—one that is configured to first test a game field and then automatically display the actual game to be played to a player prior to the initiation of game play, before the player makes the decision to play the game. An electronic game processor configured to test and then preview the game to the player before the player decides to play the game was not well-understood, routine or conventional at the time of the invention. Appx1825-1826 (¶¶231-232), Appx1829 (¶237d), Appx1918 (200:4-12).

### 2.    The Disclosed Invention

The 223 Patent teaches the principles of the invention in terms of the preferred embodiment:  a modified version of TTF.  Appx0134 (3:59-63).



FIG. 1A

Appx0124.  "On each play of the electronic game, the game software program constructs a puzzle or task for the player to solve.  The electronic game always incorporates at least one correct solution and sometimes generates alternative solutions that may not provide the same prize as the best solution."  Appx0134 (3:65-4:2).

8

The game utilizes an award table which shows that there is greater value associated with certain winning combinations (3 Titanium symbols in a row) as opposed to others (3 Cherries in a row):

## TABLE 1

### Tic-Tac-Fruit (Classic)

| Symbol/Denomination | 50¢ | $1.00 | $2.00 | $4.00 |
|---|---|---|---|---|
| 3 Titanium | $250* | $500* | $1,000* | $2,000* |
| 3 Spinner | 80¢ | $1.60* | $3.20* | $6.40* |
| 3 Flip | * | * | * | * |
| 3 Bell | $2.50 | $3 | $10 | $20 |
| 3 Plum | $1 | $2 | $4 | $8 |
| 3 Orange | 8¢ | 16¢ | 32¢ | 64¢ |
| 3 Lemon | 4¢ | 8¢ | 16¢ | 32¢ |
| 3 Cherry | 2¢ | 4¢ | 8¢ | 16¢ |

Appx0135.

"The game constructs the field so that the initial field does not place three of the same symbols in a row wherein a row is interpreted as being oriented horizontally, vertically, or diagonally." *Id.* (4:12-15).  With a three-by-three field, there are three possible horizontal "lines" (i.e., winning combinations), three possible vertical lines, and two possible diagonal lines.  In one embodiment, the player gets a choice of replacing one of the initial nine spots or tiles with the "wild" symbol.  The game's construction of the field guarantees that at least one line may be formed by placing the wild symbol selection in the proper spot.  *Id.*

9

(4:15-25).  For example, two lines may be formed if the optimal spot for the "wild"

symbol is selected, as illustrated below:



FIG. 1B

Appx0125.  In another embodiment, the display presents a series of animated reels

that, once the player elects to play the game, the player can "nudge" up or down to

rotate the reels into a winning combination.  Appx0138 (11:43-60).

"Since there are eight symbols and nine spots on the field, the total number

of combinations is approximately 134 million."  Appx0134 (4:36-38).  However,

because a game field cannot have any initial complete (winning) lines, the total

number of initial combinations is reduced to approximately 118 million.  Valid

fields are determined by using "an embedded computer processor to iterate through

10

and test each combination" to determine if it has any complete (winning) lines. Appx0134 (4:38-43).

"The Tic-Tac-Fruit electronic game does not pick random fields until testing indicates that one is acceptable.  Instead, the field is constructed to meet certain criteria."  *Id*. (4:51-55).  The steps involved in constructing a field in this electronic game are as follows:

1. Choose the number of winning lines (1, 2, 3, 4);

2. Choose the orientation of each winning line (horizontal, diagonal, vertical);

3. Choose the symbols for each of the lines (e.g., cherries, plums, bells);

4. Fill in empty slots with random symbols;

5. Test the complete field for compliance with the goals set by steps 1 and 3 and repeat the construction process if compliance fails.

*Id*. (4:55-64).  The iterative process described in the specification is therefore: TEST compliance with STEP1; TEST compliance with STEP3; IF either TEST fails, THEN repeat STEP1.  ELSE game field is completed.  Appx1006-1007.

Thus, the invention of the 223 Patent "test[s] the [game] field for compliance with at least one of the preceding selections prior to presenting the field to the player.  The displayed game field cannot contain a winning combination before play."  Appx0136 (9:63-66).  The testing at Step 5 above is needed to "ensure that

11

a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field." Appx0140 (16:59-62).

The game field testing feature of the 223 Patent altered the prior art TTF to allow a player to preview a game before the player commits to play that game. Appx1751-1753 (¶¶56-58). Just as prior art electronic gaming terminals did not preview an actual game to be played, they did not generate, much less test, the game field prior to the player's commitment to play the game.

The specification states that the invention "provid[es] a game preview display to players of an amusement or entertainment electronic game before playing the game." Appx0133 (1:64-67).

> The field is presented to the player on the game display as a preview of the game in step 602. In one embodiment, the player can select from a plurality of game preview displays, with each game preview being associated with a different play level. Any potential player can observe the game display for as long as desired before making a decision to play the displayed game in decision step 604.

Appx0137 (10:37-43). *See also* Appx0130 (602, 604).

"The preview screen of the present invention can be used in various additional embodiments." Appx0138 (11:14-15). For instance, "the preview screen could actually be the results screen, displaying the game outcome. Such a preview screen could display a winning or a non-winning combination. The player would play the displayed game knowing the outcome in order to have the

12

electronic gaming system provide the next game preview display." Appx0138 (11:20-26).

These examples of the game preview feature of the 223 Patent reduce the role of chance in relation to the role of skill. Appx1015 (¶109).

## II.   PROCEDURAL HISTORY

In August 2019, Appellants initiated this action under 35 U.S.C. § 271, alleging that certain of Appellees Pennsylvania Coin, LLC's and PA Coin Holdings, LLC's (collectively "Appellees") skill-based gaming terminals infringe claim 44 of the 223 Patent. Appellees counterclaimed for declaratory judgment of patent invalidity and non-infringement.

### A.   Orders on the Motion to Dismiss and Related Motion for Summary Judgment of Patent Invalidity

On November 15, 2019, Appellees moved to dismiss Appellants' amended complaint, arguing that the 223 Patent claims recite patent-ineligible subject matter. Appx0050. On April 1, 2020, the district court denied the motion, finding that the 223 Patent claims were directed to an abstract idea under step one of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014) but that Appellants adequately alleged an inventive concept under *Alice* step two. Appx0058-0062. The district court determined on *Alice* step one that this Court's decision in *In re Smith*, 815 F.3d 816, 817 (Fed. Cir. 2016) ("wagering game utilizing real or virtual standard playing cards" was patent-ineligible) was most analogous, finding the 223

13

Patent claims to be directed to the abstract idea of "rules for playing a game."

Appx0058. Regarding *Alice* step two, however, the district court noted:

> [T]he firmware in the game processor [] performs the task of converting a game of chance into a game of skill. While it may ultimately be proven that this firmware is an abstract idea without any inventive concept, the court finds that viewing the allegations in [Appellants'] favor, the amended complaint and '223 Patent adequately allege an inventive concept sufficient to survive a motion to dismiss. Whether the technology embedded into the game processor is an improvement and "inventive concept" is a question of fact that the court cannot determine at this early stage of litigation.

Appx0061-0062.

On January 28, 2022, Appellees moved for summary judgment on the lone remaining cause of action, Appellees' counterclaim of patent invalidity, specifically arguing that the 223 Patent claims lack patent eligibility. On September 19, 2022, the district court granted the motion, adopting its prior finding that the claims are directed to an abstract idea under the law of the case doctrine and further concluding that the claims do not recite an inventive concept under *Alice* step two. Appx0108-0109, Appx0120. Specifically, the Court decided that the 223 Patent "fails to transform computer hardware, tools, and components into the 'something more' required for an inventive concept." Appx0114. Although the district court assessed that the "automatically displaying limitation" of Claim 44 (and all other claims) of the 223 Patent was not conventional or well-understood

14

in the art at the time of invention, it was "simply a restatement of the rules of game play, which is an abstract idea." *Id.* As such, the district court held that the limitation is "insufficient to transform the rules of playing a game into an inventive concept." *Id.* Finally, the district court held that the 223 Patent claims do not describe a technological solution to a technological problem because the impetus for the 223 Patent was to overcome various legal barriers to electronic gaming. Appx0119.

**B. Claim Construction Order and Stipulated Partial Judgment**

On December 21, 2020, the district court entered a claim construction order resolving the parties' differences as to the meaning of certain terms. One of the terms ruled upon was "an actual game to be played." Appx0082-0085. The Court construed the term to mean "the constructed game field of the game to be played." Appx0085. The district court based its ruling on a sentence from the prosecution history including the following language: ". . . the actual game to be played (i.e. the game field constructed in the first recited step) . . . ." Appx0085. That sentence fell within the discussion of a different claim term that was subsequently removed from the pending claims prior to allowance, however, and in fact "an actual game to be played" was not added to the claim language until later in prosecution. As a result of the district court's construction of "an actual game to be played," the as-construed claims exclude multiple preferred embodiments.

15

In view of the district court's construction of "an actual game to be played," Appellees withdrew their claim of patent infringement while preserving their rights to appeal. The district court granted the parties' stipulated motion to dismiss on April 1, 2022, entering partial judgment in favor of Appellees on the patent infringement claim. Appx0095-0096. Appellees' counterclaim for declaratory judgment of patent invalidity remained in the case. Appx0096.

### C.     Final Judgment and Notice of Appeal

The district court ordered final judgment in favor of Appellees, which the clerk of court on September 19, 2022. Appx0122. On October 13, 2022, Appellees filed a timely notice of appeal of: (1) the portion of the district court April 1, 2020 Order finding that the 223 Patent is directed to an abstract idea of rules for playing a game; (2) the district court's December 21, 2020 claim construction Order; (3) the district court's April 1, 2022 judgment of patent non-infringement; (4) the district court's summary judgment Order of patent invalidity based on 35 U.S.C. §101 due to the perceived lack of an inventive concept in the claims; and (5) the September 19, 2022 final judgment in favor of Appellees. Appx2109.

### SUMMARY OF THE ARGUMENT

In ruling on Appellees' motion to dismiss, the district court oversimplified the claims and misapplied the law. Its *Alice* step one analysis superficially, and

erroneously, likened the claims of the 223 Patent to the inapposite patent claims at issue in *In re Smith*, which concerned the rules of a physical card game performed solely by human players. Unlike in *In re Smith*, the 223 Patent claims are not directed to "rules for playing a game." Rather, they are directed to a technological improvement in electronic gaming terminal technology, enabling a specific type of skill-based game that was not possible in the prior art. This Court has repeatedly found similar claims relating to expanded computer functionality patent-eligible under *Alice* step one.

The district court's *Alice* step two analysis also misapplied the law in finding the claimed game processor configured to perform the testing and automatic display elements is not significantly more than abstract "rules for playing a game." The district court did <u>not</u> determine that the specially-configured game processor was merely conventional, well-understood, and/or routine activities at the time of invention. Rather, the district court improperly sidestepped this entire issue by erroneously finding that the claimed processor—with its multiple specific configuration requirements—was tantamount to the abstract idea itself.

The fact that legal obstacles to electronic gaming motivated the 223 Patent's technological improvement to the electronic gaming system is a red herring. Inventor Pace's system is undeniably technology developed to improve prior art gaming systems, regardless of his specific impetus to innovate.

17

Finally, for its construction of the meaning of "an actual game to be played," the district court erroneously equated this term to a "constructed game field of an actual game to be played." It did this despite the fact that both "game" and "game field" are used as separate terms with different meanings in the claims, and that "game" has a plain meaning that is broader than "constructed game field." Moreover, the district court erroneously ignored embodiments of the invention where the display of the "actual game to be played" does not show the constructed game field. Finally, the district court erroneously found that a statement in the prosecution history relating to the "display" of a "game field" was dispositive of the meaning of "an actual game to be played," even though "an actual game to be played" was not used in any of the claims under consideration at that time and the statement's use of "i.e." was too vague under this Court's precedent to signal lexicography.

**ARGUMENT**

## I.    STANDARD OF REVIEW

### A.    Summary Judgment

The Court "review[s] the grant of summary judgment *de novo*, drawing all reasonable inferences in favor of the non-moving party." *Nystrom v. TREX Co.*, 424 F.3d 1136, 1141 (Fed. Cir. 2005). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

18

249 (1986). Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

### B.    Patent Eligibility

This Court reviews *de novo* a district court's determination of § 101 patent eligibility. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1311 (Fed. Cir. 2016).

Under 35 U.S.C. § 101, "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" is eligible for patent protection. Contesting patent eligibility under § 101 is considered a challenge to the patent's validity. *See Nat. Alts. Int'l, Inc. v. Creative Compounds, LLC*, 918 F.3d 1338, 1342 (Fed. Cir. 2019). Under 35 U.S.C. § 282, a patent is presumed valid and the burden of establishing invalidity rests on the party asserting invalidity. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 91 (2011). Therefore, any fact that is pertinent a potential conclusion of patent invalidity under § 101 "must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

The Supreme Court established a two-step framework in *Alice* to determine patent eligibility under § 101. *See Alice*, 573 U.S. at 217-18. In *Alice* step one, the district court considers whether the patent claim is directed to a law of nature, natural phenomenon, or abstract idea. *See id.* Because "all inventions at some

level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," district courts should articulate <u>with specificity</u> what the asserted claims are directed to. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). A district court may not read claims "at such a high level of abstraction" that they become "untethered from the language" used, such "that the exceptions to § 101 swallow the rule." *Id.* at 1337.

For *Alice* step two, the court considers whether "the elements of each claim both individually and as an ordered combination" form an "inventive concept"—that is, "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217-18 (internal quotation omitted). An inventive concept "can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (reversing district court determination of invalidity under § 101).

### C.    Claim Construction

Claim construction is also question of law, and "when the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history)," this Court reviews that construction *de novo*. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). This

20

Court reviews any "subsidiary factual findings [on extrinsic evidence] under the 'clearly erroneous' standard." *Id.* at 838.

## II.   PATENT ELIGIBLITY UNDER 35 U.S.C. § 101

### A.   Step One—The 223 Patent Claims Are Directed to an Inventive Electronic Gaming System, not Merely "Rules for Playing a Game."

Recognizing that "all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," the Supreme Court cautioned in *Alice* that "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice*, 573 U.S. at 217. Thus, at step one, "it is not enough to merely identify a patent-ineligible concept underlying the claim; [the Court] must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016). "[T]hat inquiry requires that the claims be read as a whole," *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018), "distinguish[ing] between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more," *Alice*, 573 U.S. at 217 (internal quotations omitted). "Whether at step one or step two of the *Alice* test . . . , a court must look to the claims as an ordered combination[.]" *McRO*, 837 F.3d at 1313.

For purposes of *Alice* step one analysis, the claims are read in light of the specification. "In our eligibility analysis, we consider the claim as a whole, and read it in light of the specification." *Packet Intelligence LLC v. NetScout Systems, Inc.*, 965 F.3d 1299, 1309 (Fed. Cir. 2020) (citations omitted). "'[S]oftware-based innovations can make 'non-abstract improvements to computer technology' and be deemed patent-eligible subject matter at step 1." *Id.* (quoting *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304 (Fed. Cir. 2018)).

The district court's finding that the 223 Patent claims are directed to "rules for playing a game" constitutes reversible error because it ignores the technological improvement and expanded gaming system functionality enabled by the claimed invention. Appx0066 (district court finding that the "technology [of the 223 Patent] transforms games of chance into games of skill, which then allows skill-based amusement machines in jurisdictions where the use of gambling devices, i.e. games of chance, are largely outlawed"). It is true, of course, that the claims relate to an electronic game, and every game necessarily has rules, but that does not end the step one inquiry. *See Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) ("That a mathematical equation is required to complete the claimed method and system does not doom the claims to abstraction."). Rather, the question at step one is whether the claimed subject matter goes beyond merely reciting game rules to "implementing an improvement in electronic [gaming]

functionality." *Data Engine Techs. LLC*, 906 F.3d at 1011.  The 223 Patent

claims, when viewed as a whole, unquestionably do so.

The 223 Patent claims do not merely recite a game in the abstract or the

rules for automating or playing such a game.  Nor do they merely recite the use of

generic computing technology to automate the playing of a game, such as video

poker or bingo.  Representative claim 44 instead explicitly recites "an electronic

game terminal" configured with "a touch screen display" and a "game processor"

specifically-programmed with several sequential functions.  These programmed

functions, recited in limitations [44.3]-[44.8] *supra*, enable the touch screen

gaming terminal to perform a specific type of game not possible in prior art

electronic gaming systems.  Most prior art gaming terminals were limited to

playing games of chance, wherein a user would initiate gameplay and the terminal

would then randomly generate a game board, usually using RNG, often resulting in

an outcome without any user input.  The 223 Patent, by contrast, discloses and

claims a novel gaming terminal architecture that (a) tests the game field and (b)

previews the actual game to be played, <u>before</u> the player commits to play the game,

thereby elevating skill and lessening the role of chance in the game, while

maintaining a familiar user experience.  Specifically, by configuring the terminal's

game processor to "construct[]" and "test[ a] game field prior to displaying the

game to the player," "determin[e] at least one winning combination," and then

23

"automatically display[] an actual game to be played on the touch screen . . . prior to initiating activation of game play," the claimed system permits a terminal to control certain aspects of the game outcome while simultaneously assigning limited control to the player.  As prior art gaming terminals were not capable of performing this style of game—at least not without substantial reconfiguration—the 223 Patent claims a technological improvement over the art, expanding the capabilities of touch screen gaming terminals.

This Court has found claims directed to similar innovations in the computer-related arts patent-eligible under *Alice* step one.  In *Data Engine Techs. LLC*, for example, the patents at issue were "directed to and claim[ed] a method of implementing a notebook-tabbed interface . . . [within] electronic spreadsheets," which made the spreadsheets easier to navigate.  906 F.3d at 1003 ("In contrast to conventional electronic spreadsheets, the method claimed . . . include[d] user-familiar objects . . . such as notebook tabs.") (internal quotations omitted).  Finding the claims patent-eligible, the Court explained that the patents "provide[d] a specific solution to then-existing technological problems in computers and prior art electronic spreadsheets . . . [i.e.,] that prior art computer spreadsheets were not user friendly."  *Id.* at 1007-08.  "The [p]atents solved this known technological problem in computers in a particular way—by providing a highly intuitive, user-friendly interface with familiar notebook tabs for navigating the three-dimensional

24

worksheet environment." *Id.* Rejecting the accused infringer Google's arguments that the claims were patent-ineligible, the Court stated that "Google fail[ed] to appreciate the functional improvement achieved by the specifically recited notebook tabs in the claimed methods." *Id.* at 1010-11.

Similarly in *McRO*, the claimed invention related to "an integrated method embodied in computer software for use with a computer . . . allowing for . . . animation products to be produced in a very cost effective manner." *McRO, Inc.*, 837 F.3d at 1307. The claimed process utilized "automation [] accomplished through rules . . . aimed to produce more realistic speech . . . ." *Id.* The Court found the claims patent-eligible because "[t]he claimed process use[d] a combined order of specific rules that [were] used and applied to create desired results . . . ." *Id.* at 1315. This went beyond "merely organizing existing information into a new form or carrying out a fundamental economic practice," which had been deemed patent-ineligible in prior cases. *Id.* (internal quotations omitted).

And in *DDR Holdings, LLC v. Hotels.com, L.P.*, the patent at issue was "directed to systems and methods of generating a composite web page that combine[d] certain visual elements of a 'host' website with content of a third-party merchant[, f]or example, [by] combin[ing] the logo, background color, and fonts of the host website with product information from the merchant." 773 F.3d 1245, 1248 (Fed. Cir. 2014). The patents "explain[ed] that prior art systems allowed

25

third-party merchants to lure the host website's visitor traffic away from the host website because visitors would be taken to the third-party merchant's website when they clicked on the merchant's advertisement on the host site." *Id.*  The patents "provide[d] a solution to this problem" by "permit[ting] a website visitor, in a sense, to be in two places at the same time." *Id.*  Finding the claims patent-eligible under *Alice* step one, the Court explained that even though "the claims involve[d] both a computer and the Internet," they did "not merely recite the performance of some [known] business practice . . . along with the requirement to perform it on the Internet,"  but rather used "computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257.

The solution in *DDR Holdings* was deemed an advance over the prior art, even though the prior art did not necessarily preclude the solution, and the solution articulated by the claims did not involve extraordinary technological know-how. The Court explained that the patent claims at issue

> do not recite an invention as technologically complex as
> an improved, particularized method of digital data
> compression.  But nor do they recite a commonplace
> business method aimed at processing business
> information, applying a known business process to the
> particular technological environment of the Internet, or
> creating or altering contractual relations using generic
> computer functions and conventional network operations,
> such as the claims in *Alice*, *Ultramercial*, *buySAFE*,

26

> *Accenture*, and *Bancorp*.  The claimed system, though
> used by businesses, is patent-eligible under § 101.

*Id*. at 1259.

The 223 Patent claims are analogous to those at issue in *Data Engine Techs.*, *McRO*, and *DDR Holdings* because, as in those cases, the 223 Patent claims are directed to a specific technological innovation that improves upon the functionality of prior art electronic gaming systems.  Like the claims directed to the improved spreadsheets of *Data Engine Techs.*, the improved animation creation software of *McRO*, and the improved website design of *DDR Holdings*, the 223 Patent claims recite several specific processing steps that enable new electronic gaming terminal functionality, generating value for both skill-based players and terminal operators seeking to offer electronic skill games.  Indeed, the 223 Patent claims do not merely describe a game or recite a generic outcome of gameplay, but rather recite, *inter alia*, specific "logical structures and processes" performed by in internal processor that fall squarely within the realm of patent-eligibility.  *Enfish*, 822 F.3d at 1339 ("Much of the advancement made in computer technology consists of improvements to software that, by their very nature, may not be defined by particular physical features but rather by logical structures and processes.  We do not see in *Bilski* or *Alice*, or our cases, an exclusion to patenting this large field of technological progress.").  *See also McRO*, 837 F.3d at 1315 ("While the result may not be tangible, there is nothing that requires a method be tied to a machine or

27

transform an article to be patentable. The concern underlying the exceptions to § 101 is not tangibility, but preemption.") (internal citation and quotations omitted).

The district court's finding that the instant case is more analogous to *In re Smith*, 815 F.3d 816 (Fed. Cir. 2016), than *McRO* showcases the legal error in its analysis. The claims at issue in *In re Smith* recited the rules of a physical card game performed solely by human players. *In re Smith*, 815 F.3d at 817 (Fed. Cir. 2016) ("A method of conducting a wagering game comprising: . . . a dealer providing at least one deck of . . . physical playing cards . . . ."). The claims did not recite <u>any</u> technology at all, let alone a specific set and sequence of processor rules for augmenting the computer functionality as recited in the claims of *McRO*, *Data Engine Techs.*, *DDR Holdings*, and the 223 Patent. The *In re Smith* court's finding that the claims were directed to a patent-ineligible "method of exchanging financial obligations," *id.* at 818-19, rather than a patent-eligible technological innovation, thus has no bearing on the present case. *See, e.g.*, *DDR Holdings*, 773 F.3d at 1257 (distinguishing a patent-eligible "solution [] necessarily rooted in computer technology" from "the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet").

The district court's overly-reductive conclusion that the 223 Patent is directed to "rules for playing a game" further demonstrates its legal error. As this Court has explained, "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337 (criticizing district court's characterization of a specifically claimed "data storage and retrieval system for a computer memory" as being directed to simply "the concept of organizing information using tabular formats"). Similar district court oversimplifications of the claims warranted reversal in each of *McRO* and *Data Engine Techs*. *See McRO*, 837 F.3d at 1309 (reversing district court's finding that the claims were directed to "the abstract idea of using rules"); *Data Engine Techs.*, 906 F.3d 999, 1006 (reversing district court's finding that the claims were "directed to the abstract idea of using notebook-type tabs to label and organize spreadsheets").

Here, the district court's characterization of the 223 Patent as being directed to "rules for playing a game" was too general, and incorrect at any level of abstraction. The 223 Patent claims do not recite "rules for playing a game," but rather recite rules <u>for a processor to follow</u> to enable a touch screen gaming terminal to run a particular type of game as a skill-based game. This distinction further aligns the present case with *Data Engine Techs.*, *McRO*, and *DDR Holdings*, in which the claims were directed to computer processes, and

29

distinguishes cases like *In re Smith* and *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005 (Fed. Cir. 2014) (also relied upon by the district court), in which the claims recited actual game rules for governing human actions.

The district court also improperly considered the inventor's motivation behind the 223 Patent in its Section 101 analysis, stating that "the 223 Patent was developed in the context of gaming laws regulating what constitutes a skill-based game and have advanced a particular way of playing a game that deals with that legal framework." (Appx0054 (internal quotation omitted) (apparently crediting Appellee's argument that "the context in which the applicants developed the 223 Patent is important" to *Alice* step one).) Although the claimed invention overcomes a legal obstacle in the gaming industry, it does so by solving a technological deficiency in prior art gaming terminals, which lacked the combination of the "testing" the game field and "displaying an actual game to be played" before the player has committed to play the game. *See DDR Holdings*, 773 F.3d at 1257 ("Although the claims address a business challenge (retaining website visitors), it is a challenge particular to the Internet."). Prior art touch-screen gaming terminals were not capable of running the type of skill-based game contemplated by the 223 Patent, which the 223 Patent remedied by providing a novel architecture of processor instructions. To the extent the legal backdrop of

30

the 223 Patent invention story has any relevance to its validity, it would be to the motivation to combine inquiry of an obviousness analysis, not patent eligibility.

The district court also apparently credited Appellees' argument that people can practice an oversimplified version of the claims of the 223 Patent in the context of a card game. Appx0054. However, approximately six months after the district court's ruling on *Alice* step one, *EcoServices, LLC v. Certified Aviation Services, LLC*, 830 F. App'x 634, 642-45 (Fed. Cir. 2020), refuted the persuasiveness of an analogy of the claimed process to prior human activity.

Finally, the district court made no findings that the 223 Patent preempts the use of an abstract idea. The Supreme Court in *Alice* explained that "the concern that drives [the Section 101] exclusionary principle [i]s one of pre-emption," i.e., the risk that a patent "'would effectively grant a monopoly over an abstract idea.'" *Alice*, 573 U.S. at 216 (quoting *Bilski v. Kappos*, 561 U.S. 593, 611-12 (2010)). In the present case, the specific concern is whether the 223 Patent preempts all skill-based electronic gaming enabled by processor rules. *McRO*, 837 F.3d at 1315 ("The narrower concern here is whether the claimed genus of rules preempts all techniques for automating 3–D animation that rely on rules."). As in *McRO*, the risk of preemption here is essentially nonexistent, as "[t]he specific structure of the claimed rules would prevent broad preemption of all rules-based means of" skill-based electronic gaming. *Id. See also DDR Holdings*, 773 F.3d at 1259 ("It is also

31

clear that the claims at issue do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same, or of any other variant suggested by NLG.  Rather, they recite a specific way to automate the creation of a composite web page . . . .").

Accordingly, the Court should reverse the district court's erroneous finding that the 223 Patent is directed to a patent-ineligible concept under *Alice* step one. Rather, the claims are "directed to a particular [sequential] manner" of testing a game field and previewing an actual game to be played in an electronic gaming terminal.  *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1362 (Fed. Cir. 2018).

### B.    Step Two—The 223 Patent Claims Recite Significantly More than "Rules for Playing a Game."

The focus of *Alice* step two is on whether, considering the elements of each claim individually and as an ordered combination, there are additional elements beyond the abstract idea found in step one to "transform the nature of the claim" into patentable subject matter.  573 U.S. at 217-218.  That is, courts must consider whether the claims recite an "inventive concept": an element of the claims or a combination of elements that ensures the claims recite "significantly more" than an abstract idea.  *Id.*  Claims recite significantly more than an abstract idea when they "involve more than the performance of well understood, routine and conventional activities known in the industry," *Berkheimer*, 881 at 1367 (internal quotation

omitted), which is a question of fact, *id.* at 1369 ("Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination."). "In computer-implemented inventions, the computer must perform more than 'well-understood, routine, conventional activities previously known to the industry.'" *CosmoKey Solutions GmbH & Co. KG v. Duo Security LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021) (quoting *Alice*, 573 U.S. at 223). Thus, the step two analysis does not focus on the general character of the claims as in step one, but instead it looks more closely at the specific limitations and assesses, as a factual matter, their technological contribution to the art. *See Alice*, 573 U.S. at 225.

The district court erred when it found that the 223 Patent claims fail step two of the *Alice* analysis as a matter of law. *See* Appx0109-0120. At a minimum, the record establishes a genuine issue of material fact requiring remand for trial. The record shows specific, not-abstract elements of the claims, beyond the alleged abstract idea of "rules for playing a game," that "transform" the claims of the 223 Patent into patent-eligible subject matter. These inventive concepts include, *inter alia*, the requirement that the "game processor" be configured to carry out the following ordered steps:

- "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning

33

combination is not generated inadvertently in completing the field"

(sometimes referred to in its short form as the "testing step") and

- "automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" (sometimes referred to in its short form as the "automatically displaying step").

Appx0140-0141 (16:47-17:2 (emphasis added)).  Specifically, "the claims recite an inventive concept by requiring a specific set of ordered steps that go beyond the abstract idea identified by the district court and improve upon the prior art by providing" an electronic gaming method that both tests the game field and previews the game, before the player decides whether to play the game. *CosmoKey Solutions*, 15 F.4th at 1099.

The district court opined that "[i]n looking for 'something more' to satisfy *Alice* step two, the court <u>cannot</u> rely on the <u>basic</u> use of computers to carry out an <u>already well-known process</u>."  Appx0112 (quoting *RaceTech, LLC v. Kentucky Downs, LLC*, 167 F. Supp. 3d 853, 864 (W.D. Ky. 2016)) (emphasis added).  Of course, the specially-configured game processor of claim 44 represents more than the "basic use" of computers "to carry out an already well-known process."  On the contrary, the claimed sequential process of "testing" and "automatic displaying" was undisputedly not known in the prior art.

Here, the prior art TTF is the only known gaming terminal that practiced the testing step alone, albeit <u>after</u> the player committed to play the game. Appx0134 (4:51-64), Appx0135 (5:59-6:18), Appx0102. The district court merely recited the prior art TTF testing step, Appx0102, while overlooking the fact that the step two inquiry "goes beyond what was simply known in the prior art." *Berkheimer*, 881 F.3d at 1369. In the case at bar, no evidence suggested that a game processor configured to practice the ordered combination of these testing and automatic display steps was well-understood, routine, and conventional in the art. On the contrary, Appellees' own expert <u>admitted</u> at deposition that the "automatically displaying" limitation itself was <u>not</u> "conventional, well-known and routine":

> Q. Well, okay, the – let's turn to [the 223 Patent] and to Claim 44, which is Column 16. And it says one of the limitations is "automatically displaying an actual game to be played on the touchscreen game display to a player prior to initiating activation of gameplay." Was that limitation as a whole, in your view, conventional, well known, and routine in June of 2006?
>
> A. I think as a whole, the answer is probably no.

Appx1918 (200:4-12) (objection to form of question omitted). The existence of these elements and this testimony, when considered under the step two *Alice* framework of analysis, require vacatur of the district court's summary judgment order. This result is mandated whether one looks at these elements of the claims individually or in their ordered combination. *See BASCOM Global Internet*

35

*Services,* 827 F.3d at 1352 (the "inventive concept c[ould] be found in the ordered combination of the claim limitations that transform the abstract idea . . . into a particular, practical application of that abstract idea.").

The evidence in this case stands in stark contrast to the evidence that was before this Court in *In re Smith*, when it found claims not patent-eligible under step two. 815 F.3d at 819. There, the Court expressly acknowledged that "not . . . all inventions in the gaming arts [are] foreclosed from patent protection under § 101," but found that the claims were patent-ineligible because they merely involved "shuffling and dealing a standard deck of cards," which were "purely conventional activities." *Id.* In short, there were no specific elements of the claims, unlike in the present case, transforming the abstract gaming idea into patent-eligible subject matter.

Perhaps the district court's most significant error in finding the 223 Patent claims invalid under step two was its determination that, in contradiction of this Court's holding in *Berkheimer*, the district court did not need to consider whether the testing and automatic display components of the claims, as ordered, were "well-understood, routine and conventional." Appx0117-0118. The district court merely held that the "automatically displaying" limitation is simply a restatement of the "rules of game play, which is an abstract idea," and, subsequently concluded it cannot supply the inventive step. *Id.* However, neither the "automatically

36

displaying" step, or the "testing" step which precedes it, nor the ordered combination of the two, constitute "rules of game play" or any other abstract idea. This is facially apparent from the claim language itself, presented in the following chart:

| Abstract Idea Found by District Court | Specific "Testing" and "Automatically Displaying" Elements |
|---|---|
| "rules of game play" | "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field"<br><br>"automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" |

On its face, the claimed "testing" is divorced from the "rules of a game." It is invisible to the game player and entirely for the benefit of the game provider—to make sure that the game player cannot win more than the "determined winning combination." The "testing" element also is not "abstract." While "testing" in a vacuum, without the written description provided in the 223 Patent's claims and specification, potentially could give the impression of a high-level idea, the element as recited in the claims identifies the nature of a specific test and the time that the test takes place in relative to the other claimed steps. To conclude that this element is "abstract" flies in the face of the Supreme Court's admonition in *Alice* that at "some level, all inventions embody, use, reflect, rest upon, or apply laws of

37

nature, natural phenomena, or abstract ideas." 573 U.S. at 217 (internal quotation omitted).

The "automatically displaying" step likewise is facially divorced from the "rules of a game." There is no "rule of a game" that is impacted by this step. This step also is not abstract, as it dictates precisely when the display takes place (i.e., prior to the game player initiating game activity) and where the display must appear (i.e., in the touch screen visible to the player).

The district court's incorrect conclusion that these elements are themselves abstract undergirded its decision to sidestep the requisite factual examination of whether the elements—both individually and as an ordered combination—were "well understood, routine [and] conventional activities known in the industry." Appx0110, Appx0118. Indeed, the district court provided no express discussion regarding whether the ordered combination of these elements constitutes an inventive concept as required by established precedent.

The district court also erred by shoehorning this case into the set of cases holding that merely implementing the abstract idea on a generical computer is not an inventive concept. Appx0111-0114. The district court never analyzed or explained in any detail, for example, how the specifically-configured electronic game processor of the 223 Patent is a generically-claimed computer part. The district court cited *In re Smith* as support, but as the district court acknowledged,

38

that case involved the "shuffling and dealing a standard deck of cards" rather than specially-configured computer hardware. Appx0113. *In re Smith* thus hardly supports the conclusion that the specially-configured processor of claim 44 of the 223 Patent somehow equates with generically claimed computer parts. Likewise, the district court's observation that it construed certain terms of the claims of the 223 Patent as compatible with certain conventional technology (i.e., "game processor" and "program instructions"), Appx0114, overlooks the specific, non-conventional configuration of the game processor recited in the ordered combination of steps, as recited in the 223 Patent claims.

Lastly, the district court erred by concluding that the claims of the 223 Patent are not patent eligible because the inventor developed the technology in response to a legal problem as opposed to a technological problem. Appx0119-0120. This Court has never held that patent-eligibility rests on an inventor's particular motivation to innovate. On the contrary, in the context of evaluating other invalidity arguments, this Court has stated that an "inventor's insights, willingness to confront and overcome obstacles, and yes, even serendipity, cannot be discounted" when evaluating patent validity. *Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008). Confronted with a potential legal obstacle barring electronic game terminals, inventor Pace applied a technological solution to create a new and improved game terminal to overcome it,

which is as deserving of patent protection as any other endeavor.  Indeed, as

Appellants pointed out to the district court and as supported by the record before

this Court, numerous patents on their face show that they arose as solutions to

regulatory/legal issues.  Appx2006-2049 (including patents regarding vehicle

bumper assemblies and engine combustion control).

Accordingly, the district court erred in finding the 223 Patent claims directed

to an abstract idea under *Alice* step one, and erred again in finding that the claims

do not contain an inventive concept under step two.  The Court should reverse

accordingly, and vacate the district court's summary judgment order finding the

223 Patent claims patent-ineligible.

## III.    CONSTRUCTION OF "AN ACTUAL GAME TO BE PLAYED"

| Appellant's Proposed Construction | District Court's Adopted Construction |
|---|---|
| "the game to be played, including an otherwise unknown system-generated attribute of it" | "the constructed game field of the game to be played" |

Appx083.

In its claim construction order, the district court construed "an actual game

to be played" as "the constructed field of the game to be played," rejecting

Appellants' proposed construction of "the game to be played, including an

otherwise unknown system-generated attribute of it."  The adopted construction is

erroneous because it defies the plain meaning of the term and excludes preferred

embodiments presented in the 223 Patent.  The only support in the intrinsic evidence the district court relied on for its construction—a statement in the prosecution history relating to a totally different claim term—fails to meet the exacting standards for lexicography or disclaimer.  Appellants' proposed construction, by contrast, accords with the plain meaning of the claim language and does not exclude any preferred embodiments.  The Court should accordingly vacate the district court's claim construction order as it pertains to "an actual game to be played."

### A.    Only Appellees' Proposed Construction Accords with the Plain Meaning of the Claim Language.

The claim language "actual game to be played" is clear on its face.  The plain meaning simply refers to a game that can and will be played.  Not only would a person of ordinary skill in the art ("POSITA")[1] understand what an "actual game" is, so would a lay judge or jury.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) (Where "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, . . . claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words.").  Appellants'

---

[1] A POSITA would have had a bachelor's degree in computer engineering, computer science, or similar field of study, and at least 2-3 years of professional experience as an engineer designing and developing games for a gaming company. Appx0990, Appx1740 (¶33).

41

proposed construction's reference to "the game to be played . . ." simply acknowledges the well-understood plain meaning of this claim language. Absent lexicography or disclaimer in the intrinsic evidence, Appellants' plain meaning proposed construction of the claim language is correct. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning as understood by a [POSITA] when read in the context of the specification and prosecution history. There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.").

The second portion of Appellants' proposed construction—". . . including an otherwise unknown system-generated attribute of it"—merely describes a feature of the game to be played as a POSITA would understand from the surrounding claim language. *Phillips*, 415 F.3d at 1314 ("Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms."). Claim 44 separately recites, for example, "a game processor for <u>generating an interactive electronic game</u> . . . [from] plurality of elements . . . [including] a plurality of predetermined game symbols . . . <u>prior to displaying the game to the player</u>." Appx0140-0141 (16:47-17:2). The displayed "actual game to be played" therefore necessarily

42

includes "an otherwise unknown system-generated attribute of it," as one or more of a new game's system-generated attributes (e.g., elements, symbols) are unknown to the player prior to the gaming terminal's display of that game. Accordingly, Appellants' proposed construction encapsulates the plain and ordinary meaning of the claim language and is presumptively correct.

The district court's adopted construction, by contrast, facially contradicts the plain and ordinary meaning of the claim language. As a matter of basic logic, "an actual game to be played" and "the constructed game field of the game to be played" cannot refer to the same thing because "the constructed game field" in the district court's construction is merely an attribute of a particular "game to be played." The district court's replacement of "actual game" with "constructed game field" therefore categorically changes the scope of the claim in a manner no POSITA would infer from the claim language itself.

Moreover, "actual game to be played" and "game field" appear separately in claims 44 and 51, further suggesting to a POSITA that "actual game" has a different meaning than "game field":

> . . . testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;
>
> automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play; . . .

43

Appx0140-0141 (16:47-17:2) (emphasis added). "[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in meaning of those terms." *Core Wireless Licensing S.A.R.L.*, 880 F.3d at 1370. *See also Inline Plastics Corp. v. EasyPak, LLC*, 799 F.3d 1364, 1371 (Fed. Cir. 2015) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims."). Had the patentee intended "an actual game to be played" to merely refer to the antecedent "game field," he could have easily done so by writing "the field" instead of "an actual game to be played" as he did elsewhere in the claim. The separate recitation of "game field" and "actual game" thus further solidifies that the district court's adopted construction flies in the face of the plain meaning.

## B.    The District Court's Adopted Construction Improperly Excludes Preferred Embodiments.

Not only does the district court's adopted construction contradict the plain meaning of the claim language, it also excludes preferred embodiments from the scope of the claims in violation of this Court's well-established precedent. "[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment." *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1220 (Fed. Cir. 2020). *See also Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018), *as amended* (Sept. 20, 2018) (rejecting

44

proposed construction that would exclude disclosed embodiments where "the claim language does not require the exclusion of those embodiments, and there is no basis in the intrinsic record for excluding them").  Specifically, the district court's construction improperly excludes embodiments where the gaming terminal does not present a fully-constructed game field to the player prior to initiating gameplay, but rather presents other information previewing the game to be played.

The 223 Patent states that "[t]he preview screen of the present invention can be used in various [] embodiments."  Appx0138 (11:14-15).  In one disclosed embodiment, "[t]he displayed game [is] the result which may or may not be a winning combination of symbols."  Appx0138 (11:48-49) (emphasis added).  A POSITA would understand from this disclosed embodiment that the "displayed game" is an "actual game to be played," and that the previewed game screen can display the game by depicting something other than a combination of symbols (i.e., other than a constructed game field), especially considering the fact that each game has a winning outcome.  *See, e.g.*, Appx0140-0141 (16:47-17:2) (claim 44) (". . . determining at least one winning combination for each play of the game . . .").  The preview screen could instead simply present, for example, a maximum award that could be won when the next game is played.

Another explicit embodiment disclosed by the 223 Patent presents a series of animated reels that, once the player elects to play the game, the player can "nudge" up or down to rotate the reels into a winning combination:

> The preview screen could also be implemented in an electronic game having a plurality of reels, each reel having a plurality of symbols, and a nudge feature and/or wild symbol. The game display could have a next game preview positioned in a space adjacent or in proximity to the main game display. A nudge game is one in which the player has an option to nudge one of the reels up or down one or more positions after the reels stop spinning in order to achieve a winning combination, usually along a pay line associated with the plurality of reels.

Appx0138 (11:43-60). In such an embodiment, a player would not be able to preview a fully "constructed game field of the game to be played," because the player would not be able to see any symbols revealed by the nudging of the reels. Nudging a reel down by one position, for example, would reveal a previously unknown symbol that was above the previewed matrix. Similarly, nudging a reel up by one position would reveal a previously unknown symbol below the previewed matrix.

The district court's adopted construction would improperly exclude these and other disclosed embodiments without sufficient basis in the intrinsic evidence for doing so. *Bowers v. Baystate Techs. Inc*., 320 F.3d 1317, 1332 (Fed. Cir. 2003) ("[E]xclud[ing] from claim scope [a] preferred embodiment of [a patent is] a

46

disfavored result."). Appellants' proposed construction, by contrast, does not exclude any embodiments and is fully consistent with the intrinsic evidence.

### C.    There Is No Lexicography or Disclaimer in the Intrinsic Evidence Supporting the District Court's Adopted Construction.

As discussed above, the district court's adopted construction materially deviates from the plain meaning of the claim language and even excludes disclosed embodiments from the scope of the claims. As such, the district court's construction could <u>only</u> be correct if it were mandated by a clear and unmistakable disclaimer or lexicography in the intrinsic evidence. As this Court has explained, "We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that. To constitute disclaimer, there must be a clear and unmistakable disclaimer." *Thorner*, 669 F.3d at 1366-67. "[L]exicography [and] disavowal . . . [b]oth . . . require a clear and explicit statement by the patentee." *Id.* at 1367-68. In this case, there is no such clear and unmistakable lexicography or disclaimer in the intrinsic evidence. The district court's construction is thus erroneous and the Court should reject it in favor of Appellants' plain meaning construction.

The district court found that a passage from the 223 Patent's prosecution history "provide[s] a definition" (i.e., lexicography) for "actual game to be played," Appx0085, but the relied-upon passage—which states ". . . the actual game to be played (i.e. the game field constructed in the first recited step) . . ."—is

47

far from lexicography when read in its full context.  Indeed, the relied-upon sentence fragment merely referred to then-existing claim language that was subsequently removed prior to allowance, without suggesting any form of intentional disclaimer or lexicography by the patentee.

The alleged lexicography appears in a January 26, 2010 amendment to a final office action.  Appx0905, Appx0938.  Independent claim one at that time, as amended, recited "[a]n electronic gaming method comprising the steps of: constructing a game field having a plurality of elements for an interactive touch screen game display . . . [and] automatically displaying the game field on the touch screen display to a player prior to initiating activation of game play . . . ."  Appx0906 (emphasis added).  In explaining the claim language to the examiner, the applicant stated,

> [I]ndependent claims 1, 14, 27, 40, 47, and 54 have been amended to recite "automatically displaying the game field on the touch screen display to a player prior to initiating activation of game play."  This recitation clarifies that the actual game to be played (i.e., the game field constructed in the first recited step) is automatically displayed to the player in order for the player to decide whether to initiate play of the actual game field that is displayed.

Appx0931.  Although the passage coincidentally uses the language "the actual game to be played," that language did not appear in any of the claims at that time.  Rather, the claims recited a first step of "constructing a game field" and a second

48

step of "displaying the game field." Appx0906. When the applicant referred to "the game field constructed in the first recited step," he was referring to the "constructing a game field" step then present in the cited claims. He was not clearly and unmistakably intending to provide a limiting definition of a phrase— "the actual game to be played"—that was then not even a claim limitation. *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013) (statements "amenable to multiple reasonable interpretations . . . cannot be deemed clear and unmistakable").

As none of the claim language relevant to the district court's cited exchange between the applicant and the examiner appears in the final 223 Patent claims, the passage is largely irrelevant to the claim construction analysis and in any event fails to rise to the level of lexicography or disclaimer. To the extent it is relevant at all, it actually supports Appellants' proposed construction rather than the district court's adopted construction. Rather than maintaining the second step claim language of "displaying the game field" present in January 2010, the applicant later replaced that language with "displaying an actual game to be played." That change in claim language was presumptively intended to modify the claim scope, in this case by broadening it to not be limited to displaying a constructed game field. *See Inline Plastics Corp.*, 799 F.3d at 1371 (Fed. Cir. 2015) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in

49

separate claims."); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003) ("Our court has made clear that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.") (internal quotation omitted). It is well-established that "an applicant can broaden as well as restrict his claims during the procedures of patent examination," *Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1317 (Fed. Cir. 2007), which is exactly what the applicant did in this case.

Finally, even if the passage relied on by the district court pertained to the term "an actual game to be played" (which it does not), it would still not rise to the level of lexicography or disclaimer necessary to depart from the plain meaning. *GE Lighting Solutions, LLC v. AgiLight, Inc.,* 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("The standards for finding lexicography and disavowal are "exacting."). This Court has repeatedly held that the use of "i.e." does not convey an intentional definition or disclaimer, at least without further support from other intrinsic evidence. In *Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.*, for example, the patent's specification stated "saccharides (i.e., sugars)," but the Court declined to find that "sugars" was the proper construction of "saccharides" because doing so would exclude one of the inventor's embodiments. 429 F.3d 1364, 1373 (Fed. Cir. 2005). The Court emphasized that "the claim term [must be understood] in the

50

context of <u>the entire patent</u>" and that "[a] claim construction that excludes a preferred embodiment . . . is 'rarely, if ever, correct.'"  *Id*. at 1373-74 (emphasis added).  *See also Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1326 (Fed. Cir. 2012) ("i.e." was not definitional where a contrary holding would result in eliminating embodiments described in the specification); *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1370 (Fed. Cir. 2012) (in context, "i.e." did not indicate lexicography or clear disavowal of claim scope); *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1355 (Fed. Cir. 2014) (same).  As discussed above, the application of "i.e." as definitional in this case would improperly exclude embodiments and contradict the plain meaning of the claim language.

For the forgoing reasons, the Court should reverse the district court's construction of "an actual game to be played," and instead adopt Appellees' proposed construction.

## CONCLUSION

For the reasons set forth above, Appellees request that the Court reverse the district court's judgment holding the claims of the 223 Patent patent-ineligible, vacate the district court's claim construction order as it pertains to the term "an actual game to be played," and vacate the district court's judgment of non-infringement based on that claim construction.  Appellees further request that the Court remand the case to the district court for further proceedings.

Dated: January 4, 2023                    Respectfully submitted,

                                          /s/ Steven G. Hill
                                          Steven G. Hill
                                          David K. Ludwig
                                          Hill, Kertscher & Wharton
                                          3625 Cumberland Blvd., Suite 1050
                                          Atlanta, GA 30339
                                          Phone: 770-953-0995
                                          Fax: 770-953-1358
                                          sgh@hkw-law.com
                                          dludwig@hkw-law.com

                                          *Attorneys for Plaintiffs-Appellants*
                                          *Savvy Dog Systems, LLC and POM of*
                                          *Pennsylvania, LLC*

# ADDENDUM

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SAVVY DOG SYSTEMS, LLC, and POM OF PENNSYLVANIA, LLC, | : | Civil No. 3:19-CV-01470 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA COIN, LLC, and PA COIN HOLDINGS, LLC, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

**MEMORANDUM**

Before the court is Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC's motion to dismiss. (Doc. 31.) Defendants argue that the patent at issue claims patent-ineligible subject matter pursuant to 35 U.S.C. § 101, and that the amended complaint fails to state a plausible claim for patent infringement. Applying the standard established by the Supreme Court in *Alice Corporation Pty. Ltd. v. CLS Bank International*, this court finds that although the claim at issue is an abstract idea, Plaintiffs have adequately alleged an inventive concept sufficient to survive a motion to dismiss. For the reasons that follow, the court will deny the motion. (Doc. 31.)

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiffs Savvy Dog Systems, LLC ("Savvy Dog") and POM of Pennsylvania, LLC ("POM") (collectively, "Plaintiffs") initiated this action via complaint on August 23, 2019, against Defendants Pennsylvania Coin, LLC and

1

PA Coin Holdings, LLC (collectively, "Defendants").  Defendants filed a motion to dismiss, prompting Plaintiffs to file an amended complaint on November 1, 2019.  (Docs. 21, 25.)  The single count in the amended complaint sets forth a claim for patent infringement under 35 U.S.C. § 271 of Savvy Dog's Patent Number: US 7,736,233 ("'223 Patent").  (Doc. 25.)

The following facts are gleaned from Plaintiffs' amended complaint and the '223 Patent attached thereto for the purpose of ruling on Defendants' motion to dismiss.[1]  Savvy Dog is the record title owner of the '223 Patent, and POM has an exclusive license to the '223 Patent in Pennsylvania.  (Doc. 25, ¶ 13.)  The '223 Patent was filed on June 30, 2006, and issued on June 15, 2010, with the title of "Electronic Gaming Method and System Having Preview Screen."  (*Id.* ¶ 14.)  Summarizing the background of the '223 Patent, Plaintiffs aver that "[t]he use of gambling devices with game processors to implement games of chance (e.g., bingo, slot machines, poker) is largely outlawed because the games in question are considered games of chance."  (*Id.* ¶ 18.)  However, most jurisdictions permit "skill-based amusement machines."  (*Id.*)  "To qualify as a skill-based amusement machine . . . the outcome of play during the game must be controlled by the person

---

[1] While the amended complaint provides significant factual detail, the parties' briefs narrow the pertinent facts for resolving this motion.  As such, the court will only summarize the most pertinent facts from the amended complaint here.

2

playing the game and not by predetermined odds or random chance controlled by the machine." (*Id.*)

The abstract of the '223 Patent describes it as follows:

An electronic gaming method and system with a game preview display. A field of game symbols is presented on the game display to the player as a preview for deciding whether or not to play the displayed game. If the player decides to play the game, the player selects a field element to turn the symbol displayed into a wild symbol. The player's selection of the field element for the wild symbol location is received by the game software which determines and displays each winning combination of symbols that is formed by such wild symbol location selection. A new game field can then be constructed and previewed on the game display.

(Doc. 25-1, p. 2.)[2] Thus, the processor "test[s] the field for compliance with at least one of the preceding selections prior to presenting the field to the player. The displayed game field cannot contain a winning combination before play." (*Id.* at 16.) According to Plaintiffs' amended complaint, prior to the time of this invention, gaming terminals did not contain a game processor that incorporated this preview element patented by the '223 Patent because "[t]he electronic gaming industry considered such practices counter-intuitive." (Doc. 25, ¶¶ 16–22.)

Plaintiffs aver that the '223 Patent encompasses novel, non-obvious electronic game processor technology including, but not limited to, "a game processor that is specifically configured for testing the game elements and

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

3

automatically previewing the feature of a game to be played prior to initiating activation of game play." (*Id.* ¶ 25.)

The amended complaint alleges infringement of claim 44 of the '223 Patent. (*See* Doc. 25.) Claim 44 provides:

> **44.** An electronic gaming system comprising:
> an electronic game terminal including a touch screen display;
> a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:
> constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;
> determining at least one winning combination for each play of the game;
> testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generating inadvertently in completing the field;
> automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;
> determining if the player has decided to play the displayed game; and
> displaying an outcome resulting from play of the displayed game.

(Doc. 25-1, pp. 19–20.)

Plaintiff POM incorporated the game processor detailed in claim 44 of the '223 Patent in jurisdictions which do not permit games of chance, but do permit games of skill, such as Pennsylvania. (Doc. 25, ¶ 32.) Because these games were commercially successful, other companies such as Banilla Games sought to copy POM's approach by "embedding a game board suitable for installation into a gaming terminal with a specifically configured game processor that performs

4

testing and preview features in an effort to elevate the level of skill associated with the game." (*Id.*) Plaintiffs allege that Defendants infringed and continue to infringe on the '223 Patent by selling "electronic video gaming terminals equipped with gaming (circuit) boards supplied by Banilla Games, and having preloaded thereon one or more games described by Banilla Games as 'Preview + Skill' Games. . . . and Fusion Games." (*Id.* ¶¶ 41–42.)

On November 15, 2019, Defendants filed a motion to dismiss Plaintiffs' amended complaint along with a supporting brief. (Docs. 31–32.) Plaintiffs opposed the motion on December 2, 2019, and Defendants timely filed a reply and request for oral argument. (Docs. 37–39.) The court granted Defendants' request for oral argument on February 25, 2020, and oral argument took place on March 17, 2020. (Doc. 49.) During oral argument, the parties utilized presentations which were admitted as exhibits. (Doc. 56.) Following argument, the court ordered supplemental briefing on specific cases discussed and cited by Plaintiffs. (Doc. 57.) Plaintiffs timely submitted their brief on March 20, 2020, and Defendants submitted their brief on March 25, 2020. (Docs. 58–59.)

### JURISDICTION

Because this case raises a federal question of patent infringement under 35 U.S.C. § 271, the court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). Further, venue is appropriate under 28 U.S.C. §§ 1391 and 1400(b).

## STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion, courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). This type of motion to dismiss tests the sufficiency of the complaint against the pleading requirements of Rule 8(a) necessitating "a short and plain statement of the claim showing that the pleader is entitled to relief," and giving "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Although a complaint need not contain detailed factual allegations, to survive a Rule 12(b)(6) motion, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

However, the court cannot dismiss a complaint simply because "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips*, 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 556–57). Rather,

6

**Appx0049**

Rule 8 requires "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

**DISCUSSION**

In their motion to dismiss, Defendants argue that the court should dismiss the amended complaint because the '223 Patent claims patent-ineligible subject matter under 35 U.S.C. § 101. (Doc. 32, pp. 12–27.) Alternatively, Defendants argue that Plaintiffs have failed to plead a plausible direct infringement claim and willful infringement claim, and that the court should dismiss the amended complaint with prejudice.[3] (*Id.* at 27–34.)

## A. Patent Eligibility

Section 101 provides, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. There are three subject matter categories that are patent ineligible: laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

---

[3] Plaintiffs stipulate to withdraw "their allegations of willful infringement, without prejudice, pending any discovery which might support a claim of willfulness." (Doc. 37, p. 23.) Accordingly, the court will grant Defendants' motion to dismiss Plaintiffs' willful infringement claim without prejudice. Furthermore, because the court is not dismissing Plaintiffs' amended complaint, Defendants' final argument regarding dismissal with prejudice is moot.

7

Because patent eligibility under section 101 is a question of law, it can be determined at the motion to dismiss stage. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) (hereinafter "*Aatrix I*"). However, "plausible factual allegations may preclude dismissing a case under § 101 where, for example, nothing on the record . . . refutes those allegations as a matter of law or justifies dismissal under rule 12(b)(6)." *Aatrix I*, 882 F.3d at 1125 (alterations and internal quotations omitted) (quoting *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F. 3d 1089, 1097 (Fed. Cir. 2016)). If there are claim construction disputes at this stage, the court must either adopt the non-moving party's constructions or "resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction." *Id.* (citing *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1346 (Fed. Cir. 2014); *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016)).

In determining section 101 eligibility, the court need not "parse each individual claim," rather, analyzing a patent's representative claim is sufficient. *Wolf v. Capstone Photography, Inc.*, No. 2:13-CV-09573, 2014 WL 7639820, at *10 n.3 (C.D. Cal. Oct. 28, 2014) (citations omitted). Here, the parties agree that

claim 44 is representative of the '223 Patent at least for the purpose of resolving

Defendants' motion to dismiss.  (Doc. 60, pp. 40:20–41:2.)[4]

In *Alice*, the Supreme Court reaffirmed the framework set forth in *Mayo*

*Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), "for

distinguishing patents that claim laws of nature, natural phenomena, and abstract

ideas from those that claim patent-eligible applications of those concepts."  *Alice*,

573 U.S. at 217.  The court must first determine "whether the claims at issue are

directed to one of those patent-ineligible concepts."  *Id.*  If so, the court must

"consider the elements of each claim both individually and 'as an ordered

combination' to determine whether the additional elements 'transform the nature of

the claim' into a patent-eligible application."  *Alice*, 573 U.S. at 217 (quoting

*Mayo*, 566 U.S. at 78–79.)

### 1. *Alice* Step One

"The 'abstract ideas' category embodies 'the longstanding rule that an idea

of itself is not patentable.'"  *Alice*, 573 U.S. at 218 (quoting *Gottschalk v. Benson*,

409 U.S. 63, 67 (1972)).  While the Supreme Court has not established "a

definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy

the first step of the *Mayo/Alice* inquiry," it has recognized that "fundamental

---

[4] An official transcript of the March 17, 2020 oral argument was docketed on March 27, 2020. (Doc. 60.)

economic practices, methods of organizing human activity, and mathematical algorithms are abstract ideas." *Axcess Int'l, Inc. v. Genetec (USA) Inc.*, 375 F. Supp. 3d 533, 537 (D. Del. 2019) (alterations and quotations omitted) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016); *Bilski v. Kappos*, 561 U.S. 593, 611 (2010); *Alice*, 573 U.S. at 219; *Benson*, 409 U.S. at 64). Courts have found it instructive to "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Id.* (quoting *Enfish*, 822 F.3d at 1334.)  However, courts "must be careful to avoid oversimplifying the claims because 'at some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Id.* (alterations omitted) (quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016)).

Claim 44 describes an "electronic gaming system" that is comprised of an electronic game terminal with a touch screen display and a "game processor" which is "configured for" six steps.  (Doc. 25-1, p. 19–20.)  Those six steps that the game processor is configured for are:

> [1] constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermine game symbols;
> [2] determining at least one winning combination for each play of the game;
> [3] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined

winning combination is not generated inadvertently in completing the field;

[4] automatically displaying an actual game to be played on the touch screen display to a player prior to initiating activation of game play;

[5] determining if the player has decided to play the displayed game; and

[6] displaying an outcome resulting from play of the displayed game.

(*Id.*)

Defendants argue that the '223 Patent fails *Alice* step one because it patents the ineligible abstract idea of "a way of playing a game" and "method of gameplay." (Doc. 60, pp. 43:16–44:8.) "Distilled to its simplest form, representative claim 44 is just a way to play a game." (Doc. 32, p. 15.) In their brief, Defendants illustrate the six steps of claim 44 through a card game played by two people, and argue that "[a]pplying generic computer components to carry out the claimed human activity does *not* transform it into a non-abstract idea." (*Id.* at 16–19 (citing *RaceTech, LLC v. Ky. Downs, LLC*, 167 F. Supp. 3d 853, 863 (W.D. Ky. 2016).) Defendants further argue that the context in which the applicants developed the '223 Patent is important because it proves that the '223 Patent is a way of playing a game. (Doc. 60, p. 8:9–8:19.) Specifically, the '223 Patent was developed in the context of gaming laws regulating what constitutes a skill-based game and have "advanced a particular way of playing [a] game that deals with that legal framework." (*Id.* at 8:14–8:18.)

11

**Appx0054**

Although Plaintiffs acknowledge that the *Alice* step one analysis is a "close call," they argue that claim 44 establishes an "architecture or a platform" for elevating a game of chance to a game of skill.  (Doc. 60, pp. 28:15–28:16, 45:6–45:9.)  While Plaintiffs agree that the six steps are "rules," they are "rules for setting up a game to be played, not necessarily for playing the game."  (*Id.* at 46:2–46:7.)  In sum, Plaintiffs contend that claim 44 is a non-abstract idea because the six steps of claim 44 are rules that enable the game processor to convert a game of chance to a game of skill without a limitation to any specific game.  (*See id.* at 46:11–46:20.)  Plaintiffs further argue that Defendants' kitchen table card game oversimplifies the language of claim 44 to manual "steps," rather than acknowledging that claim 44 is "directed to a gaming system comprising a <u>tangible</u> game processor specially configured to test and preview a game."  (Doc. 37, pp. 10–11.)  To avoid oversimplification, Plaintiffs aver that the court must look at claim 44 as a whole as stated in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016).  (Doc. 60, p. 64:8–64:9.)

In support of their respective positions, the parties referred the court to cases they found to be most analogous to the case at hand.  (Doc. 60, pp. 41:9–42:14, 45:10–45:17.)  In *In re Smith*, cited by Defendants, the court examined a "wagering game utilizing real or virtual standard playing cards" that was ruled patent-ineligible on application and by the Patent Trial and Appeal Board.  815

F.3d 816, 817 (Fed. Cir. 2016).  The court concluded that the claims "directed to rules for conducting a wagering game, compare to other 'fundamental economic practice[s]' found abstract by the Supreme Court."  *Id.* at 818 (quoting *Alice*, 573 U.S. at 220).  The court ultimately held that "describing a set of rules for a game" is an abstract idea.  *Id.* at 819.

Plaintiffs cited two purportedly analogous cases for *Alice* step one – *Ameranth, Inc. v. Genesis Gaming Solutions, Inc.*, Nos. 11-00189/13-00720, 2014 WL 7012391 (C.D. Cal. Nov. 12, 2014), and *McRO, Inc. v. Bandai Namco Games America, Inc.*, 837 F.3d 1299 (Fed. Cir. 2016).  In *Ameranth*, the court denied defendants' motion for summary judgment regarding a patent claiming "computerized systems and methods for monitoring a physical casino poker game."  2014 WL 7012391 at *1.  Expressing no opinion on the motion's question of patent invalidity, the court held that Defendants failed to establish *Alice* step one because they did not satisfy their summary judgment burden.  *Id.* at *4–9.  The court stated that "[a]n inability to articulate an abstract idea to which claims are directed may be a clue that those claims satisfy section 101."  *Id.* at *9.  Because defendants raised certain arguments for the first time in their reply brief, the court to reminded defendants that its role is not "to develop winning theories for the parties."  *Id.* at *4.

13

The Federal Circuit in *McRO* held that the patents "allowing computers to produce 'accurate and realistic lip synchronization and facial expressions in animated characters' that previously could only be produced by human animators" were not abstract ideas under § 101. 837 F.3d at 1313–1316 (citations omitted). The patents created technological improvements using a combined order of specific rules to produce a sequence of synchronized animated characters. *Id.* Thus, the court found that the "claim use[d] the limited rules in a process specifically designed to achieve an improved technological result in conventional industry practice" to be patent eligible. *Id.* at 1316.

Comparing *In re Smith*, *Ameranth*, and *McRO* to claim 44, the court finds *Ameranth* and *McRO* distinguishable. Plaintiffs argue that Defendants have changed their theory of the case from a way of playing a game to a method of gameplay similar to defendants in *Ameranth*. Regardless of the terms used in their briefs versus oral argument, the court finds the argument set forth by Defendants have been consistent throughout this matter – claim 44 sets forth rules for playing a game. Additionally, *Ameranth* is unhelpful as the court expressed no opinion on the patent's validity. As to *McRO*, the patents created technological improvements that replaced a human animator's judgment. As acknowledged by Plaintiffs' counsel during oral argument, claim 44 of the '223 Patent did not invent the game processor, rather, the invention was the specific firmware embedded into a game

14

processor.  (Doc. 60, pp. 57:19–59:12.)  Thus, claim 44 is most analogous to *In re Smith*.  That is because claim 44 does not create new technology; it simply describes the rules for playing a game (albeit could be one of many games), converted from a game of chance to a game of skill.

Accordingly, reviewing claim 44 as a whole, the parties' competing characterizations, and comparing claim 44 to claims in previous cases, the court concludes that claim 44 describes the rules for playing a game, and is thus an abstract idea within the meaning of *Alice* step one.

### 2. *Alice* Step Two

In evaluating *Alice* step two, courts must look for an "inventive concept" by analyzing "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application."  *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78–79).  The additional features or elements must ensure "that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]."  *Id.* at 221 (quoting *Mayo*, 566 U.S. at 72, 79).  Furthermore, the patent-eligible application requires "more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'"  *Id.* (quoting *Mayo*, 566 U.S. at 72).

However, "patentees who adequately allege their claims contain inventive concepts survive a § 101 eligibility analysis under Rule 12(b)(6)."  *Aatrix I*, 882

15

F.3d at 1126–27 (citing *BASCOM Glob. Internet Servs., Inc.*, 827 F.3d at 1352).

"[P]lausible factual allegations may preclude dismissing a case under § 101 where,

for example, nothing in the record . . . refutes those allegations as a matter of law

or justifies dismissal under Rule 12(b)(6)." *Id.* (internal quotations and citations

omitted) (quoting *FairWarning IP, LLC*, 839 F.3d at 1097).  "Whether a claim

element or combination of elements would have been well-understood, routine,

and conventional to a skilled artisan in the relevant field at a particular point in

time may require weighing evidence, making credibility judgments, and addressing

narrow facts that utterly resist generalization." *Aatrix Software, Inc. v. Green

Shades Software, Inc.*, 890 F.3d 1354, 1355 (Fed. Cir. 2018) (hereinafter "*Aatrix

II*") (alterations and quotations omitted) (quoting *U.S. Bank Nat'l Ass'n ex rel.

CWCapital Asset Mgmt. LLC v. The Village at Lakeridge, LLC*, 138 S. Ct. 960, 967

(2018)).  On the other hand, "[i]f the specification admitted that the claim elements

are well-understood, routine, and conventional, it would be nearly impossible for a

patentee to show a genuine dispute." *Id.* at 1356.

Defendants argue that claim 44 only recites general computer components,

which is insufficient to transform the abstract idea of playing a game into an

inventive concept.  (Doc. 32, pp. 19–20.)  They aver that the game processor is

only mentioned twice in the '223 Patent specification and the claims do not

provide "further detail regarding the structure, type, or composition of the

16

Appx0059

processor." (*Id.* at 20.) Defendants contend that there is nothing in the '223 Patent that points to non-conventional hardware or software components that perform the gameplay. (*Id.* at 21.) Furthermore, the particular ordering of the rules of the game do not transform the abstract idea into an inventive concept. (*Id.* at 22.) In support of their argument, Defendants cite several examples of courts finding that without "something more," the abstract idea of playing a game cannot be transformed into an inventive concept. (*Id.* at 22–23.)

Conversely, Plaintiffs argue that a fact dispute precludes Defendants from showing that claim 44's game processor was generic technology in 2006, when the '223 Patent was applied for. Plaintiffs contend that a "fact dispute exists over whether the testing and preview elements . . . of the processor critical to infusing an element of skill into a given game were 'well-understood, routine and conventional activities commonly used in the industry.'" (Doc. 37, p. 13.) Defendants purportedly ignore the *Berkheimer*, 881 F.3d 1360 (Fed. Cir. 2018), *Aatrix I*, and *Aatrix II* decisions in focusing on whether the '223 Patent states that the game processor is non-conventional, rather than also looking to the contentions in the amended complaint. (*Id.* at 14.) Plaintiffs argue that the facts alleged in the amended complaint would only be insufficient if they were contradicted by statements in the '223 Patent, which they are not. (*Id.* at 16.) In sum, Plaintiffs' argue that the *Berkheimer*, *Aatrix I*, and *Aatrix II* decisions require the court to

17

deny Defendants' motion because Plaintiffs have alleged an inventive concept sufficient to survive a motion to dismiss.

In comparing the case before the court with the cases cited by the parties in their briefs and at oral argument, the court finds that *Maxell Ltd. v. Huawei Device USA Inc.*, No. 5:16-CV-178, 2018 WL 4179107 (E.D. Tex. Mar. 29, 2018), is an appropriate comparison. In *Maxell*, the defendant argued that the patent did not invent or improve GPS or cellular technology or do anything more than "apply conventional activities on GPS and cellular devices." *Id.* at *7. Viewing the allegations in favor of the plaintiff, the court found that "the pleadings suggest that the claimed invention is directed to an improvement in the mobile handset itself, not generic components performing conventional activities." *Id.* at *8.

Here, the amended complaint alleges that at the time the '223 Patent was applied for, the prior art did not have a game processor that could insert skill into a game of chance. (Doc. 25, ¶ 19.) The amended complaint and '223 Patent also explain how this processor is different from the prior art and that this type of gaming system was nonexistent prior to the 2006 patent application. (*Id.* ¶¶ 20–24.) Plaintiffs plead that the game processor was not conventional, well-understood or routine technology in the gaming field in 2006. (*Id.* at ¶ 29.) At oral argument, the court gained a greater understanding of the technology at issue in that it is the firmware in the game processor that performs the task of converting a

18

**Appx0061**

game of chance into a game of skill.  While it may ultimately be proven that this firmware is an abstract idea without any inventive concept, the court finds that viewing the allegations in Plaintiffs' favor, the amended complaint and '223 Patent adequately allege an inventive concept sufficient to survive a motion to dismiss. Whether the technology embedded into the game processor is an improvement and "inventive concept" is a question of fact that the court cannot determine at this early stage of litigation.  Thus, the court will deny Defendants' motion to dismiss for patent-ineligible subject matter.

### B. Plausible Patent Infringement Claim

Defendants alternatively argue that Plaintiffs' amended complaint fails to plead a claim for patent infringement under Federal Rule of Civil Procedure 12(b)(6).  (Doc. 32, pp. 27–31.)  In doing so, Defendants attempt to impart a higher burden on Plaintiffs than articulated in *Iqbal/Twombly*.  Conversely, Plaintiffs aver that the amended complaint meets the standards for asserting a direct infringement claim.  (Doc. 37, pp. 18–23.)

Under 35 U.S.C. § 271(a), a patent is infringed upon when "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent."  Plaintiffs' fifty-four page amended complaint sets forth adequate and specific facts to provide Defendants with fair notice of the claim against them and, viewed in a light most favorable to

**Appx0062**

Plaintiffs, alleges a plausible patent infringement claim.  Contrary to Defendants'

assertions, Plaintiffs' amended complaint provides much more than "copying the

language of a claim element" and baldly stating that the "accused product has such

an element."  *See N. Star Innovations, Inc. v. Micron Tech., Inc.*, No. 17-506, 2017

WL 5501489, at *2 (D. Del. Nov. 16, 2017) (requiring "some factual explanation

for what it is about the product that leads Plaintiff to think it has the required

elements").  Specifically, beginning at paragraph 42, the amended complaint

details the "infringing products" sold by Defendants in Pennsylvania, and avers

that the "infringing products" utilize specific claim elements (of claim 44 in the

'223 Patent), determined by using game terminals sold/provided by Defendants.

(Doc. 25, ¶¶ 42–115.)  Accordingly, the court will deny Defendants' motion to

dismiss based on the argument that Plaintiffs have failed to state a plausible patent

infringement claim.

### CONCLUSION

For the reasons stated herein, the court will deny Defendants' motion to

dismiss in its entirety.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: April 1, 2020

20

Appx0063

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SAVVY DOG SYSTEMS, LLC, and POM OF PENNSYLVANIA, LLC, | : | Civil No. 3:19-CV-01470 |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA COIN, LLC, and PA COIN HOLDINGS, LLC, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>ORDER</u>

**AND NOW**, on this 1st day of April, 2020, in accordance with the

accompanying memorandum of law, **IT IS ORDERED** that Defendants' motion to

dismiss is **DENIED**.  (Doc. 31.)


<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAVVY DOG SYSTEMS, LLC, and POM OF PENNSYLVANIA, LLC, | : | Civil No. 3:19-CV-01470 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA COIN, LLC, and PA COIN HOLDINGS, LLC, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court are the parties' proposed constructions for the disputed claim terms of U.S. Patent No. 7,736,223 ("'223 Patent). (Docs. 71, 72, 74, 85, 87.)

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiffs Savvy Dog Systems, LLC ("Savvy Dog") and POM of Pennsylvania, LLC ("POM") (collectively, "Plaintiffs") initiated this action via complaint on August 23, 2019, against Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC (collectively, "Defendants"). Defendants filed a motion to dismiss, prompting Plaintiffs to file an amended complaint on November 1, 2019. (Docs. 21, 25.) The single count in the amended complaint sets forth a

---

[1] Because the court is writing for the benefit of the parties and the court, limited factual background and procedural history are detailed in this memorandum.

1

Appx0065

claim for patent infringement under 35 U.S.C. § 271 of Savvy Dog's Patent Number: US 7,736,233 ("'223 Patent").  (Doc. 25.)

The technology at issue in this patent infringement lawsuit relates to an "electronic gaming method and system with a game preview display."  (Doc. 71–3, p. 2.)[2]  This technology transforms games of chance into games of skill, which then allows skill-based amusement machines in jurisdictions where the use of gambling devices, i.e. games of chance, are largely outlawed.  (*See id.* at 12.) Plaintiffs allege infringement of two independent claims within the '223 Patent, claim 44 and claim 51, with additional dependent claims adding elements to the independent claims.  (*See* Doc. 25.)

On November 15, 2019, Defendants filed a motion to dismiss Plaintiffs' amended complaint along with a supporting brief arguing that the '223 Patent claims patent-ineligible subject matter pursuant to 35 U.S.C. § 101 and that the amended complaint failed to state a plausible claim for patent infringement. (Docs. 31–32.)  Following briefing and oral argument, the court denied the motion to dismiss finding that although the claim at issue is an abstract idea, Plaintiffs adequately alleged an inventive concept sufficient to survive a motion to dismiss. (Docs. 37–39, 49, 56, 57, 58–59, 61–62.)  Thereafter, Defendants timely answered Plaintiffs' amended complaint.  (Doc. 63.)

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

2

On June 25, 2020, Defendants filed a motion to stay this action pending final resolution of non-party Banilla Games, Inc.'s Covered Business Method Review ("CBM") proceeding before the United States Patent and Trademark Office, Patent and Trial Appeal Board ("PTAB").  (Doc. 68.)  Once ripe, the court ordered that the motion would be held in abeyance until the PTAB decided whether to institute review of the CBM petition.  (Docs. 69, 70 ,77, 80.)  The parties, as requested in the court's prior order, notified the court on November 24, 2020, that PTAB denied Banilla Games, Inc's petition for institution of CBM review.  (Doc. 106.)  Thus, the court denied Defendants' motion to stay this action on December 8, 2020. (Doc. 109.)

While awaiting a PTAB decision, the court moved forward with the schedule in this case, which included the filing of a joint claim construction statement, technology tutorials, and opening and responsive claim construction briefs by the parties.  (Docs. 71, 72, 74, 86, 87, 93.)   The court held a claim construction hearing on September 15, 2020, and permitted letter briefs following that hearing on specific issues not previously addressed in the claim constructing briefing.  (Docs. 98, 100–102.)  Thus, the construction of the claims at issue in the '223 Patent is now ripe for review.

## STANDARD OF REVIEW

Claim construction is a matter of law to be determined by the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). As the case moves forward, the court's ruling becomes the basis for jury instructions at a trial. *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Walter Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim terms "are generally given their ordinary and customary meaning." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. Determining how a person of ordinary skill in the art ("POSITA") "understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.*

The ordinary meaning of claim terms as understood by a POSITA may be readily apparent to a lay person in some cases. *Id.* at 1314. However, in many cases, "determining the ordinary and customary meaning of the claim requires

4

**Appx0068**

examination of terms that have a particular meaning in a field of art." *Id.* The court must look to "those sources available to the public that show what a [POSITA] would have understood disputed claim language to mean." *Id.* This is primarily done by reviewing intrinsic evidence, which consists of the claim language, the claim specification, and the prosecution history. *Id.* at 1312–17; *see also Arlington Indus. Inc. v. Bridgeport Fittings, Inc.*, No. 3:01-cv-0485, 2008 WL 542966, at *1 (M.D. Pa. Feb. 25 2008). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.2d at 1314 (citing *Vitronics*, 90 F.3d at 1582). However, the claims do not "stand alone," but are part of "a fully integrated written instrument," which consists "principally of a specification that concludes with the claims." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). The specification "is always highly relevant to the claim construction analysis" and is generally dispositive as "the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics*, 90 F.3d at 1582). Further, the inventor's lexicography will govern when the specification reveals "a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Id.* at 1316.

In addition to the claim terms and specification, the prosecution history of the patent at issue "provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent." *Id.* at 1317. However, the prosecution

history may lack the same clarity as the specification because it "represents an ongoing negotiation" between the Patent and Trademark office and the patent applicant. *Id.* "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

The court may also consider extrinsic evidence, such as dictionaries, treatises, and expert testimony, but such evidence "is less significant than the intrinsic record in determining 'the legally operative meaning of claim language'" and "is unlikely to result in a reliable interpretation of patent scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1317–19 (citations omitted).

## DISCUSSION

At the outset, the court notes that the parties generally agree that the definition of a POSITA in this case is a person, in 2006, who had a bachelor's degree in engineering or computer science, or an equivalent thereof, and at least two years of development experience in the electronic gaming industry.

Turning to the constructions, the parties agree upon two constructions in this case. First, the parties agree that the term "prior to displaying" should be construed as "before making visible on the touch screen display." (Doc. 71-1, p.

6

1.) And second, the parties agree that the term "computer readable code" should be construed as "code in a form that can be executed by the computer." (*Id.*) Because the parties agree to these constructions, the court will adopt the proposed construction of both terms.

The parties submitted competing constructions for seven terms in the '223 Patent. (Doc. 71-2.) During briefing and argument, the parties narrowed their disagreements regarding some of these terms. The court will address each term in the order in which they were argued at the September 15, 2020 claim construction hearing.

### 1. "Winning combination"

The term "winning combination" appears in 22 of the 75 claims in the '223 Patent. (*See* Doc. 71-2, pp. 2–3.) Initially, the parties set forth the following proposed constructions for the term "winning combination":

> Plaintiffs: "array of symbols yielding a successful outcome <u>or corresponding to a prize</u>."[3] (Doc. 71-2, p. 2.)

> Defendants: "array of <u>game</u> symbols <u>in the game field</u> yielding a successful outcome." (*Id.*)

Following the submission of their opening claim construction briefs, Plaintiffs revised their proposed construction to "narrow the scope of disagreement between

---

[3] In all proposed claim constructions within this memorandum, the court underlines the differences between the proposals for clarity.

**Appx0071**

the parties." (Doc. 86, p. 12.) At that point, the proposed constructions were as follows:

> Plaintiffs: "array of game symbols yielding a successful outcome, <u>including the award of a prize</u>." (*Id.*)

> Defendants: "array of game symbols <u>in the game field</u> yielding a successful outcome." (Doc. 87, p. 15.)

During the claim construction hearing, Defendants then revised their proposed construction based on Plaintiffs' revision. (*See* Doc. 98-2, p. 9.) The final proposed constructions for "winning combination" are:

> Plaintiffs: "array of game symbols yielding a successful outcome, <u>including the award of a prize</u>." (Doc. 86, p.12.)

> Defendants: "array of game symbols <u>in the game field constituting a win</u>." (*See* Doc. 98-2, p. 9.)

Although Defendants contend that Plaintiffs' constructions have "been a moving target," Plaintiffs' revision narrowed the disagreement between the parties while Defendants' revision broadened that disagreement. In determining the proper construction for "winning combination," the court finds it appropriate to construe the proposed constructions with the least disagreement, i.e. Plaintiffs' revised construction with Defendants' original construction. In fact, in their responsive claim construction brief, Defendants argue that because Plaintiffs concede certain language, the court should adopt Defendants' original proposed construction. (Doc. 87, p. 15.) The court is mindful that the construction

8

determined by the court will guide jury instructions in this matter, and Defendants'

revised construction creates more confusion than clarity.  Thus, the court reviews

the following proposed constructions in this section:

> Plaintiffs: "array of game symbols yielding a successful outcome, <u>including the award of a prize</u>."  (Doc. 86, p. 12.)

> Defendants: "array of game symbols <u>in the game field</u> yielding a successful outcome."  (Doc. 87, p. 15.)

Plaintiffs argue that Defendants' proposed insertion of "in the game field" is

unnecessary because a POSITA understands "that a winning combination can exist

regardless of whether it is in the game field," and that "the specification rejects the

notion that 'winning combination' itself should be construed as symbols 'in the

game field.'"  (Doc. 86, p. 12.)  They further argue that "winning line," "complete

line," and "winning combination" are used interchangeably in the specification,

and that the "preview embodiment" displays "merely 'a winning or non-winning

combination' of the game to be played."  (*Id.* at 12–13.)  Conversely, Defendants

argue that the '223 Patent describes the "winning combination" of symbols in

relation to a constructed game field.  (Doc. 72, pp. 20–21.)

The court turns to the intrinsic evidence for guidance.  The abstract of the

'223 Patent describes that the "player's selection of the field element" ultimately

"determines and displays each winning combination of symbols."  (Doc. 71–3,

hereinafter "'223 Patent", Abstract.)  Further, in numerous locations, the

9

specification describes that the "winning combination" is constructed within the "game field," "field element," or "field of game symbols." ('223 Patent, 2:12–26, 2:40–45, 2:59–64, 2:59–4:25, 4:36–64, 5:15–67, 6:1–32; 9:49–11:13.) The claims themselves similarly use this language. ('223 Patent, 12:50–13:6; 13:20–31, 13:53–14:13, 14:61–15:21, 16:8–16:26, 16:47–17:2, 17:22–45, 18:1–27, 18:46–19:11, 19:31–21:21.) Thus, reviewing the specification and claim language, the court finds that including "in the game field" is consistent with the intrinsic evidence.

As to "yielding a successful outcome, including the award of a prize," Plaintiffs argue that this construction eliminates any uncertainty of what constitutes a "successful outcome." (Doc. 86, p. 13.) They aver that without "including the award of a prize," jurors would be confused by combinations yielding low-value prizes that "are not winning combinations, because the outcome is not successful enough (*e.g.* where the prize awarded does not exceed the cost to play the game)." (*Id.* (emphasis in original).) Defendants argue that language regarding "a prize" is unnecessary and confusing because "prize" is not defined in the specification, nor does Plaintiffs' proposal define "prize." (Doc. 72, pp. 21–22.)

Here, the court agrees with Defendants that inserting "including the award of a prize" muddies the water, rather than defines successful outcome. Plaintiffs do not point to intrinsic evidence within the '223 Patent specification or claims that

10

**Appx0074**

define "prize."  Furthermore, the court is not convinced that a POSITA or juror would misunderstand or misinterpret a "successful outcome" to mean that a low-value prize is not a successful *enough* of an outcome.  Accordingly, following review of the parties' arguments and intrinsic evidence, the court will construe "winning combination" to mean an "array of game symbols in the game field yielding a successful outcome."

### 2. "[Determining/determine/determined] at least one winning combination for each play of the game"

The term "[determining/determine/determined] at least one winning combination for each play of the game" appears in 9 of the 75 claims in the '223 Patent.  (*See* Doc. 71-2, pp. 3–4.)  Initially, the parties set forth the following proposed constructions:

> Plaintiffs: "establish[ing] or ascertain[ing] at least one array of symbols yielding a successful outcome or corresponding to a prize for each game to be played."  (*Id.* at 3.)

> Defendants: "guaranteeing/guarantee/guaranteed at least one winning combination that may be formed for each game to be played."  (*Id.*)

Again, following the submission of their opening claim construction briefs, Plaintiffs revised their proposed construction so that the competing proposed constructions are as follows:

> Plaintiffs: "establish or ascertain at least one winning combination, properly construed, for each game to be played." (Doc. 86, p. 14.)

11

**Appx0075**

Defendants: "guaranteeing/guarantee/guaranteed at least one winning combination that may be formed for each game to be played." (Doc. 71-2, pp. 3–4.)

Plaintiffs submit that without "clear lexicography from the patentee," which is missing in this case, "guarantee" should not replace "determine." (Doc. 86, p. 14.)  The '223 Patent only uses "guarantee" once in a non-definitional manner and it is inconsistent with the way the '223 Patent uses "determine." (*Id.*)  Conversely, construing "determine" as "establish or ascertain" is confirmed by the claims and "stays true" to the usage of "determine" throughout the '223 Patent. (*Id.*)

Defendants argue that defining "determine" as "establish[ing] or ascertain[ing]" adds confusion by providing two different dictionary definitions of "determine." (Doc. 72, p. 24.)  Plaintiffs' proposed construction would also make this term impermissibly broad because "it could be misunderstood to encompass a basic award scheduled," but the "[m]ere creation of an award schedule does not guarantee that a winning combination will be [sic] actually be achievable by a player in a given game, which is what the claim requires." (*Id.* at 24–25.)  While providing many reasons for the court to disregard Plaintiffs' proposed construction, Defendants' support for construing "determine" as "guarantee" is that the specification uses "guarantees" once in describing that each game is winnable. (*Id.* at 23.)

12

Appx0076

In construing this term, the court recognizes that it must review the entire phrase, rather than a single word, because the "meaning of a phrase is often greater than the sum of the individual words." *ADE Corp. v. KLA-Tencor Corp.*, 252 F. Supp. 2d 40, 58 (D. Del. 2003).  Furthermore, it is unnecessary that "each claim read on every embodiment." *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010).  However, Defendants would like to court to adopt a construction using a word that appears only once in the '223 Patent to replace a word that appears throughout the specification and claims.  (*See* '223 Patent, 4:20.)

In reviewing the '223 Patent claims, the court finds that adopting Defendants' proposed construction would be narrower than the plain and ordinary meaning of "[determining/determine/determined] at least one winning combination for each play of the game." *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012).  The only time the court should narrow a claim term beyond its plain and ordinary meaning is when: (1) "a patentee sets out a definition and acts as its own lexicographer;" or (2) "the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.* (quoting *Thorner v. Sony Comput. Ent. Am. L.L.C.*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).  These factors are not present in this case.  Moreover, using "guarantee" would be nonsensical in certain contexts of the '223 Patent.  (*See, e.g.*, '223 Patent, Fig 5, Fig 6, Fig 8, 2:21–25, 4:28–31, 4:40–50, 7:6–10, 12:50–13:6.)

13

Thus, the court finds it appropriate to construe "[determining/determine/ determined] at least one winning combination for each play of the game" as "establish or ascertain at least one winning combination, properly construed, for each game to be played."[4]  This construction "stays true to the claim language and most naturally aligns with the patent's description of the invention."  *Renishaw PLC v. Marposs Societa's per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citing *Young Dental Mfg. Co. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1142 (Fed. Cir. 1997)).

### 3. "Test[ing] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field"

This term appears in 9 of the 75 claims of the '223 Patent.  (Doc. 71-2, pp. 4–5.)  Plaintiffs' initial proposed construction broke this term into three pieces. However, Plaintiffs revised their proposed construction in their responsive brief so that the competing constructions are as follows:

> Plaintiffs: "test[ing] <u>the game field</u> prior to displaying the game to the player to ensure that <u>the anticipated outcome corresponding to the</u> winning combination, <u>properly construed</u>, is not superseded by a better

---

[4] Because neither party had addressed this issue, during the claim construction hearing, the court questioned the parties regarding the addition of "properly construed" and "that may be formed" in each party's respective proposed construction of this term.  Neither party put forth argument or evidence that convinces the court to include "that may be formed" in the construction of the term "[determining/determine/ determined] at least one winning combination for each play of the game."  As to "properly construed," the court believes this will be a helpful reminder to the jurors that a term within a term has been construed by the court.  Therefore, the court includes "properly construed" within its construction of this term.

outcome, such as a higher prize level, in making the field from the plurality of predetermined game symbols." (Doc. 86, p. 16.)

Defendants: "test[ing] the previously constructed field prior to displaying the actual game to be played to the player to ensure that a winning combination more valuable than the previously determined winning combination is not generated inadvertently when the player completes a winning combination during play of the game." (Doc. 71-2, pp. 4–5.)

Plaintiffs argue that using "the game field" is clear, versus "the previously constructed field," which is surplusage, and not consistent with the intrinsic evidence of the '223 Patent. (Doc. 86, pp. 16–17.) Defendants' proposed construction is limiting because "[f]ield construction and testing can be overlapping processes prior to displaying a game field on the screen." (Doc. 74, p. 32.) As to "prior to displaying the game to the player" versus "prior to displaying the actual game to be played to the player," Plaintiffs again argue that "the actual game to be played" language is surplusage and limiting because "'the game' being tested may not actually be displayed to the player, depending on the results of testing." (Doc. 86, p. 17; Doc. 74, p. 32.) Next, Plaintiffs submit that "more valuable than" should be construed similar to its proposed construction for "winning combination" as "having a better outcome, such as a higher prize level." (Doc. 86, p. 18.) Finally, as to "completing the field," Plaintiffs argue that Defendants cannot point the court to any lexicography showing that "the patentee intended to limit" this term strictly to "the player complet[ing] a winning

15

combination during play of the game." (*Id.* at 19.) Rather, the patent uses "complete field" and "field completely filled" to describe the system-created field. (*Id.*)

Defendants submit that the court should construe the disputed term as a single phrase because that is "consistent with the way the '223 Patent uses the phrase and will preserve internal coherence in the patent." (Doc. 72, p. 27.) Breaking the term down into the disputed portions, Defendants argue that using "the previously constructed field" clarifies that this "testing" step refers to the game field constructed in the previous step. (*Id.* at 28.) Using "displaying the actual game to be played" ensures that a POSITA understands that the game is the one displayed to the player in the "automatically displaying" step. (*Id.*) Defendants further interpret "the determined winning combination" to be consistent with the "determining" step by construing it as the "previously determinized winning combination." (*Id.* at 29.) Lastly, Defendants argue that their construction for "in completing the field" is consistent with the intrinsic evidence of the patent. (*Id.*)

At the outset, the court notes that although Plaintiffs point out reasons that the court should decline to adopt Defendants' construction of the "testing limitation" term, they fail to provide sufficient support for their proposed constructions in many instances. Notwithstanding this, the court finds it

16

**Appx0080**

appropriate to construe the "testing limitation" as a whole, in a manner consistent with the other constructions in this case, and following the specification and claim language.  Doing so, the court holds that the "testing limitation" shall be construed as follows: "test[ing] the game field prior to displaying the actual game to be played to the player to ensure that a winning combination more valuable than the previously determined winning combination, properly construed, is not generated inadvertently when the player completes a winning combination during play of the game."

4. **"Automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play"**

The term "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" appears in 9 of the 75 claims of the '223 Patent.  (Doc. 71-2, pp. 5–6.)  Initially, the parties set forth the following proposed constructions:

> Plaintiffs: "programmatically instruct[ing] the terminal display on the touch screen the identification of the next game to the player, including showing the player an otherwise unknown system-generated attribute of the next game before the player commits to play the next game." (Doc. 71-2, pp. 5–6.)

> Defendants: "automatically display[ing] an actual game to be played on the touch screen game display to the player before the player commits to play the displayed game." (*Id.*)

17

Appx0081

Plaintiffs again revised their proposed construction in their responsive brief so that the competing proposed constructions are as follows:

> Plaintiffs: "automatically display[ing] an actual game to be played, <u>properly construed</u>, on the touch screen game display to the player before the player commits to play the displayed game." (Doc. 86, p. 21.)

> Defendants: "automatically display[ing] an actual game to be played on the touch screen game display to the player before the player commits to play the displayed game." (Doc. 71-2, p. 5.)

At the claim construction hearing, the parties agreed that they no longer dispute the construction to this term, but rather, only dispute the construction of "an actual game to be played" within the term "automatically display[ing] an actual game to be played on the touch screen game display to the player before the player commits to play the displayed game." Accordingly, the court construes this claim, with agreement of the parties, as: "automatically display[ing] an actual game to be played, properly construed, on the touch screen game display to the player before the player commits to play the displayed game."[5]

### 5.  "An actual game to be played"

The term "an actual game to be played" appears within the previously construed term and 9 of the 75 claims of the '223 Patent. (Doc. 71-3, pp. 6–7.) The parties' initial proposed constructions were as follows:

---

[5] For the same reasons detailed in footnote 4, the court includes "properly construed" within this term for clarity to the jurors.

Plaintiffs: "the identification of the next game, including at least an otherwise unknown system-generated attribute of the next game." (*Id.* at 6.)

Defendants: "the constructed game field of the game to be played." (*Id.*)

Once again, Plaintiffs revised their proposed construction in their responsive brief so that the competing constructions are now as follows:

Plaintiffs: "the game to be played, including an otherwise unknown system-generated attribute of it." (Doc. 86, p. 21.)

Defendants: "the constructed game field of the game to be played." (Doc. 71–3, p. 6.)

Plaintiffs argue that with their revised construction, the only dispute is "whether the term should be limited to the preview embodiment, where the game preview screen is 'the constructed field of the game to be played.'" (Doc. 86, p. 22.) They aver that inserting "constructed field of" would narrow the broader claim language of an "actual game to be played" improperly. (*Id.*) Whereas, "the unknown system-generated attribute of" the game to be played that a player is shown in advance of the game "could be a completely constructed game field," but "it is not the only way a game to be played can be previewed to lessen the role of chance and 'stay[] true' to the invention." (*Id.* (emphasis in original).)

Defendants argue that the court is not required to construe a claim to capture every disclosed embodiment of the invention. (Doc. 87, p. 30.) Additionally, the Plaintiffs' referenced embodiments suggest that an "actual game" displayed to a

19

**Appx0083**

player is something different than "the constructed game field to be played." (*Id.* at 31.) Instead, Defendants aver that all embodiments are consistent with their construction "in that the actual *game* to be played involves display of the constructed *game field*." (*Id.*) They cite to six embodiments in support of their argument and conclude that none of the embodiments show "an actual game to be played" in anything other than "the constructed game field." (*Id.* at 31–34.)

At the hearing, Plaintiffs further illuminated the disagreement between the parties' construction:

> The difference between the parties' constructions is that the Defendants' construction requires the display of the game to be played to have a fully constructed game field of that game for the user to see. Whereas, we believe that it is adequate that it describe the game and provide the user with at least one key attribute of the upcoming game to be played that does not have to show a fully constructed game field.

(Transcript of Claim Construction Hearing at 76.)[6]

The court is mindful that "an actual game to be played" does not exist in the '223 Patent specification, but was introduced for the first time during the prosecution of this patent. Thus, while the court can review the specification for context, it cannot derive the meaning of this term therefrom. However, the prosecution history is helpful to the court because it "informs the meaning of the claim language by demonstrating how the inventor understood the invention and

---

[6] While the parties did not request a transcript of the September 15, 2020 claim construction hearing, the court obtained an unofficial copy for reference in drafting this memorandum.

20

Appx0084

whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582–83.)  Further, "a patentee's 'use of *"i.e."* signals an intent to define the word to which it refers.'" *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1200 (Fed. Cir. 2013) (quoting *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009)) (referencing the patent's specification).

The court finds the use of "i.e." within the prosecution history to be instructive here.  The January 26, 2010 Amendment provides: "This recitation clarifies that the actual game to be played (i.e. the game field constructed in the first recited step) is automatically displayed to the player in order for the player to decide whether to initiate play of the game displayed."  (Doc. 71-4, p. 190.) Although the Federal Circuit found "i.e." most instructive within the patent's specification, it is reasonable to apply that to the prosecution history when the applicant is the one using "i.e." to provide a definition.  Accordingly, the court finds that there is intrinsic evidence for construing "actual game to be played" to mean "the constructed game field of the game to be played" and will construe it as such.[7]

---

[7] As an aside, the court notes that an additional reason to reject Plaintiffs' proposed construction is that it provides more confusion than clarity.  It is hard to imagine a juror being aided by "actual game to be played" being interpreted as "the game to be played, including an otherwise unknown system-generated attribute of it."

**Appx0085**

### 6. "Game processor"

Defendants contend that "game processor," which appears in 12 of the 75 claims in the '223 Patent, but specifically claim 44, is a "means-plus-function" ("MPF") term under 35 U.S.C. § 112(f).  Thus, the court must first determine if "game processor" is an MPF term before construing it as such or reviewing Plaintiffs' proposed construction and Defendants' alternative construction.

Section 112(f) provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The court's first step is to determine whether section 112(f) applies to the term at issue.  MPF treatment applies only to "purely functional limitations that do not provide the structure that performs the recited functions." *DuPuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F. 3d 1005, 1023 (Fed. Cir. 2006).  There is a rebuttable presumption that section 112(f) does not apply when the claim does not use the term "means." *Williamson v. Citrix Online, LLC*, 792 F. 3d 1339, 1348 (Fed. Cir. 2015).  However, this presumption can be overcome "if the challenger demonstrates that the claim term fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000))

22

**Appx0086**

(alterations in original).  Prior to *Williamson v. Citrix Online, LLC*, this presumption was characterized as "strong" and very difficult to overcome.  *Id.* at 1348–49.  *Williamson* reevaluated this "strong" presumption and held that the heightened burden was "unjustified."  *Id.* at 1349.  Instead, the court reiterated the standard to be:

> [W]hether the words of the claim are understood by person of ordinary skill in the art to have a sufficiently definite meaning as the nature for structure.  When a claim term lacks the word "means," the presumption can be overcome and [§ 112(f)] will apply if the challenger demonstrates that the claim term fails to "recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function."

*Id.* (internal citations omitted).  Generic terms, characterized as "nonce" words, are tantamount to stating "means" and must be construed as such.  *Id.* at 1350.

Defendants argue that the "game processor" cited in the claims performs specific claimed functions without describing the structure for the "game processor."  (Doc. 72, pp. 14–15.)  Similarly, the specification's reference to "game processor" details nondescript and nonstructural components for performing various functions.  (*Id.* at 15.)  Thus, Defendants argue that "[b]ecause the '223 Patent treats 'game processor' as a generic placeholder for a nondescript device that simply performs the recited functions, it is a means-plus-function limitation." (*Id.*)  According to Defendants, a POSITA's understanding of a "game processor" as a conventional CPU or microprocessor would be still be an insufficient

23

**Appx0087**

disclosure of structure to avoid MPF treatment. (*Id.*) Rather, disclosure of an algorithm is needed. (*Id.* at 15–16.) Further, Defendants aver that the fact that the '223 Patent's claims do not use the term "means" does not save them from MFP treatment because district courts have found "processor" to be a substitute for "means."

Plaintiffs argue that there is a presumption that "game processor" is not subject to MPF treatment because it does not use the term "means." (Doc. 74, p. 13.) Since *Williamson*, Plaintiffs' submit that courts have recognized that "processor" is more analogous to "circuit" than to "means." (*Id.* at 13–16.) Applying the case law to claim 44 of the '223 Patent, Plaintiffs aver that claim 44 provides "appropriate objective, context and componentry," as well as an "algorithm imparting structure." (*Id.* at 17–20.)

Applying *Williamson* and reviewing the case law provided by the parties as applied to claim 44, the court finds that "game processor" provides sufficiently definite structure such that Defendants have not overcome the presumption of a non-"means" term. Specifically, the court finds several cases instructive. In *Realtime Adaptive Streaming LLC v. Adobe System*, the defendant argued that it overcame the presumption because the claims at issue only described "processors" in functional terms. No. CV 18-9344, 2019 U.S. Dist. LEXIS 125180, at *45 (C.D. Cal. July 25, 2019). The court held that the defendant did "not offer any

24

**Appx0088**

evidence to show that a person of ordinary skill in the art would not understand the word 'processor' itself to connote a class of structures." *Id.* at 45–46 (citing *Zeroclick, LLC v. Apple, Inc.*, 891 F.3d 1003, 1007–08 (Fed. Cir. 2018)). In *Odyssey Wireless, Inc. v. Apple Inc.*, the court noted that *Williamson* did not identify "processor" as a nonce word. No. 15-CV-1735-H, 2016 WL 3055900, at *11 (S.D. Cal. Mar. 30, 2016). However, other courts since *Williamson* have held that "'processor' connotes structure." *Id.* (quoting *Syncpoint Imaging, LLC v. Nintendo of Am. Inc.*, No. 2015-CV-00247, 2016 WL 55118, at *20 (E.D. Tex. Jan. 5, 2016)). The court continued stating "several district courts post-*Williamson* have concluded that the term 'processor' sufficiently connotes a definite structure to a person of ordinary skill in the art, and, therefore, found that § [112(f)] did not apply to a claim or claims that used the term 'processor.'" *Id.* at *11–12 (citing *Syncpoint Imaging, LLC*, 2016 WL 55118 at *18–21; *Smartflash LLC v. Apple Inc.*, No. 6:13-CV-447, 2015 WL 4208754, at *3 (E.D. Tex. July 7, 2015); *Finjan, Inc., v. Proofpoint, Inc.*, No. 13-CV-05808, 2015 WL 7770208, at *10–11 (N.D. Cal. Dec. 3, 2015); *Nomadix, Inc. v. Hosp. Core Servs. LLC*, No. CV 1408256, 2016 WL 344461, at *5–8 (C.D. Cal. Jan. 27, 2016)).

Here, the court finds that Defendants have not rebutted the presumption for "game processor" within claim 44 to be construed as a MPF term. Thus, the court

25

**Appx0089**

turns to Plaintiffs' proposed construction and Defendants' alternative constructions

as follows:

> Plaintiffs: "a CPU or microprocessor with input/output circuitry that executes program instructions to generate a game." (Doc. 71-2, p. 1.)

> Defendants: "a conventional CPU or microprocessor processor that executes program instructions to generate a game." (*Id.* at 2.)

Plaintiffs submit that adding "conventional" is unsupported by the intrinsic

evidence but fails to cite any authority for the same. (Doc. 74, p. 21.) However,

they additionally argue that including "conventional" would prejudice Plaintiffs to

the jury in determining the issue of patentable subject matter and be inconsistent

with the court's prior ruling on patent invalidity. (*Id.*; Doc. 61, pp. 18–19.)

Plaintiffs further argue that omitting "input/output circuitry" is a mistake as it is

"an essential part of a 'game processor' as understood by a POSITA." (*Id.*)

Defendants argue that "conventional" should be included because there is an

"absence of any intrinsic evidence specifying the game processor to have

specialized structure, or itself constituting an innovation." (Doc. 72, p. 19.)

Additionally, Plaintiffs' inclusion of "input/output circuitry" is inappropriate

because it adds a limitation that is not mentioned in the patent nor prosecution

history. (*Id.*)

In applying the principles from *Phillips*, the court finds that including

"conventional" and "input/output circuitry" are unsupported by the intrinsic record.

Thus, the court will construe "game processor" as "a CPU or microprocessor that executes program instructions to generate a game."

### 7.  "Program instructions"

Similar to "game processor," Defendants submit that "program instructions," which is included in 13 of the 75 claims, is a MPF term.  (Doc. 72, p. 39.) Defendants argue that the claims do not specify any structure for the "program instructions," and merely replace the term "means" with "program instructions." (*Id.* at 40.)  This "functional claiming" invokes section 112(f) because "simply disclosing software . . . without providing some detail about the means to accomplish the function, is not enough."  (*Id.* at 41 (citation and quotations omitted).)  Conversely, Plaintiffs argue that Defendants are simply reprising their "game processor" argument.  (Doc. 74, p. 41.)  They direct the court to claim 51 and compare "program instructions" to "computer code" arguing that "instruction" and "code" are both defined terms of art.  (*Id.* at 41–42.)

Applying *Williamson*, the court finds that Defendants have not overcome the presumption by demonstrating that the claim term fails to "recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function."  *See Williamson*, 792 F. 3d at 1349.  Thus, the court will adopt the agreed-upon alternative construction provided by the parties: "conventional commands that can be executed by a computer."

## CONCLUSION

For the reasons stated herein, the court will construe the disputed claims as detailed in this memorandum.  An appropriate order shall issue.


s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: December 21, 2020

**Appx0092**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SAVVY DOG SYSTEMS, LLC, and POM OF PENNSYLVANIA, LLC, | : | Civil No. 3:19-CV-01470 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA COIN, LLC, and PA COIN HOLDINGS, LLC, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>ORDER</u>

**AND NOW**, on this 21st day of December, 2020, upon consideration of the

parties' claim construction contentions and in accordance with the accompanying

memorandum, **IT IS ORDERED** that the terms are construed as follows:

1) The term "prior to displaying" shall be construed as "before making visible on the touch screen display."

2) The term "computer readable code" shall be construed as "code in a form that can be executed by the computer."

3) The term "winning combination" shall be construed as "array of game symbols in the game field yielding a successful outcome."

4) The term "[determining/determine/determined] at least one winning combination for each play of the game" shall be construed as "establish or ascertain at least one winning combination, properly construed, for each game to be played."

5) The term "test[ing] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field" shall be construed as "test[ing] the game field prior to displaying the actual game to be played to the player to ensure that a

1

**Appx0093**

winning combination more valuable than the previously determined winning combination, properly construed, is not generated inadvertently when the player completes a winning combination during play of the game."

6) The term "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" shall be construed as "automatically display[ing] an actual game to be played, properly construed, on the touch screen game display to a player prior to initiating activation of game play"

7) The term "an actual game to be played" shall be construed as "the constructed game field of the game to be played."

8) The term "game processor" shall be construed as "a CPU or microprocessor that executes program instructions to generate a game."

9) The term "program instructions" shall be construed as "conventional commands that can be executed by a computer."


                        s/Jennifer P. Wilson
                        JENNIFER P. WILSON
                        United States District Court Judge
                        Middle District of Pennsylvania


2

**Appx0094**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SAVVY DOG SYSTEMS, LLC, and POM of PENNSYLVANIA, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> PENNSYLVANIA COIN, LLC, and PA COIN HOLDINGS, LLC <br><br> Defendants. | CIVIL ACTION NO: 3:19-cv-01470-JPW <br><br> Honorable Jennifer P. Wilson |

**ORDER GRANTING MOTION TO ENTER JUDGMENT AND REALIGN PARTIES FOR TRIAL**

AND NOW, this 1st day of April , 2022, the Court having reviewed the Parties Stipulated Motion to Dismiss, Enter Partial Judgment and Realign the Parties, it is hereby ORDERED that:

1. Based on the parties' agreement that Savvy Dog Systems, LLC and POM of Pennsylvania, LLC cannot prevail on their claim of patent infringement in view of the Court's prior claim construction of "actual game to be played" U.S. Patent No. 7,736,223, the final judgment to be entered in this case shall include against Plaintiffs and for Defendants for Plaintiffs' infringement claim;

2. Regarding the counterclaim of Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC for a declaratory judgment of non-infringement pursuant to the Declaratory Judgment Act, 28 U.S.C. Section 2201 *et seq*.,

the Court hereby declares that Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC do not infringe any claim of U.S. Patent No. 7,736,223, and that the final judgment to be entered in this case shall include against Plaintiffs and for Defendants for Defendants' declaratory judgment counterclaim of noninfringement;

3. Because the sole remaining claim in the case for trial is the Defendants' counterclaim for declaratory judgment of patent invalidity of the claims of U.S. Patent No. 7,736,223, the Court hereby realigns the parties for purposes of the forthcoming trial.  Defendants PA Coin will be allowed to proceed first and last at trial.

4. This Order is without prejudice to the right of Savvy Dog Systems, LLC and POM of Pennsylvania, LLC to appeal the Court's adjudication of the claim construction of U.S. Patent No. 7,736,223, and the entry of judgment of non-infringement against it based thereon.

SO ORDERED this __1st__ day of __April_____, 2022.

s/ Jennifer P. Wilson
_____
Honorable Jennifer P. Wilson
U.S. District Court Judge
Middle District of Pennsylvania

2

Appx0096

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SAVVY DOG SYSTEMS, LLC, and POM OF PENNSYLVANIA, LLC, | : | Civil No. 3:19-CV-01470 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA COIN, LLC, and PA COIN HOLDINGS, LLC, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court is a motion for summary judgment filed by Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC.  (Doc. 155.)  Defendants argue that the patent at issue claims patent-ineligible subject matter pursuant to 35 U.S.C. § 101.  Applying the standard established by the Supreme Court in *Alice Corporation Pty. Ltd. v. CLS Bank International*, and incorporating this court's prior holding that the '223 Patent fails *Alice* step one, the court holds that the '223 Patent does not transform the abstract idea of rules for playing a game into an inventive concept as required by *Alice* step two.  For the reasons that follow, the court will grant Defendants' motion.  (Doc. 155.)

## PROCEDURAL HISTORY

Plaintiffs Savvy Dog Systems, LLC ("Savvy Dog") and POM of Pennsylvania, LLC ("POM") (collectively, "Plaintiffs") initiated this action via complaint on August 23, 2019, against Defendants Pennsylvania Coin, LLC and

1

Appx0097

PA Coin Holdings, LLC (collectively, "Defendants").  Defendants filed a motion to dismiss, prompting Plaintiffs to file an amended complaint on November 1, 2019.  (Docs. 21, 25.)  The single count in the amended complaint sets forth a claim for patent infringement under 35 U.S.C. § 271 of Savvy Dog's Patent Number: US 7,736,233 ("'223 Patent").  (Doc. 25.)

On November 15, 2019, Defendants filed a motion to dismiss Plaintiffs' amended complaint, arguing that the '223 Patent claims patent-ineligible subject matter under 35 U.S.C. § 101 and, alternatively, that Plaintiffs failed to plead a plausible direct infringement claim and willful infringement claim.[1]  (Doc. 31.)  Following briefing and oral argument, the court held that claim 44, which the parties agreed was representative of the '223 Patent, describes the rules for playing a game and was an abstract idea under step one of *Alice Corporation Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014).  (Doc. 61, pp. 9–15.)[2]  Moving to *Alice* step two, the court concluded that "[w]hether the technology embedded into the game processor is an improvement and 'inventive concept' is a question of fact" that could not be decided at the motion to dismiss stage.  (*Id.* at 15–19.)  Ultimately, the court denied the motion to dismiss in its entirety.  (Docs. 61, 62.)

---

[1] Plaintiffs agreed to withdraw the willful infringement claim without prejudice in their opposition to the motion to dismiss.  (Doc. 37, p. 23.)

[2] For ease of reference, the court uses the page numbers from the CM/ECF header.

2

Appx0098

Defendants subsequently answered the complaint and filed counterclaims for non-infringement and invalidity of the '223 Patent.  (Doc. 63.)

On September 15, 2020, the court held a claim construction hearing and issued its ruling on December 21, 2020.  (Docs. 111, 112.)  Based on the court's claim construction ruling, Plaintiffs moved the court to enter judgment in favor of Defendants on Plaintiffs' infringement claim and to certify the judgment under Federal Rule of Civil Procedure 54(b) so that they could immediately appeal the court's claim construction ruling.  (Doc. 117.)  Therein, Plaintiffs disagreed with the court's ruling but conceded that, based on the court's claim construction ruling, they could not establish that Defendants infringed the '223 Patent.  (Doc. 118, p. 2.)  After the motion was fully briefed and argued, the court denied the motion and permitted this case to proceed to a final judgment.  (Doc. 136.)

On January 28, 2022, Defendants timely filed a motion for summary judgment on the ground that the '223 Patent is invalid under 35 U.S.C. § 101, as well as a statement of facts and brief in support.[3]  (Docs. 155, 161, 162.)  Plaintiffs timely opposed the motion, and Defendants filed a reply.  (Docs. 169, 170, 172, 173.)  On March 15, 2022, Defendants requested oral argument on their motion,

---

[3] Defendants also filed a motion to exclude opinions and testimony of Kevin Harrigan, Ph.D. on January 28, 2022.  (Doc. 156.)  The court need not resolve that motion as it relates to trial, which is foreclosed by the court's summary judgment ruling.

3

which the court granted. (Docs. 175, 177, 182.) The court held oral argument on July 19, 2022, and ordered supplemental letter briefs following oral argument to permit Defendants to respond to newly identified case law discussed by Plaintiffs and provide the parties' positions on whether the court should revisit its ruling on *Alice* step one. (Doc. 184.) Following submission of the letter briefs, the motion for summary judgment is ripe for disposition. (Docs. 186, 187, 189.)

On March 31, 2022, the parties filed a joint motion for partial judgment and to realign the parties for trial, which the court granted the following day. (Docs. 179, 180.) Important to the resolution of this case, the parties agreed that Plaintiffs cannot prevail on their patent infringement claim based on the court's claim construction of "actual game to be played," and that judgment be entered in favor of Defendants on Count I of the amended complaint for patent infringement. (Doc. 180, p. 1.) They further agreed that Defendants be granted declaratory judgment in their favor on their counterclaim of noninfringement of the '223 Patent.[4] (*Id.* at 2.)

---

[4] At the request of the parties, the court also ordered that the parties be realigned for trial since the only remaining claim is for patent invalidity. (Doc. 180, p. 2.) However, for purposes of this opinion, the court continues to refer to the parties as originally filed because this agreement was entered into following the submission of the summary judgment papers.

4

**Appx0100**

FACTUAL BACKGROUND[5]

Savvy Dog is the record title owner of the '223 Patent, and POM has an exclusive license to the '223 Patent in Pennsylvania. (Doc. 25, ¶ 13.) The '223 Patent was filed on June 30, 2006, and issued on June 15, 2010, with the title of "Electronic Gaming Method and System Having Preview Screen." (*Id.* ¶ 14.) The abstract of the '223 Patent describes it as follows:

> An electronic gaming method and system with a game preview display. A field of game symbols is presented on the game display to the player as a preview for deciding whether or not to play the displayed game. If the player decides to play the game, the player selects a field element to turn the symbol displayed into a wild symbol. The player's selection of the field element for the wild symbol location is received by the game software which determines and displays each winning combination of symbols that is formed by such wild symbol location selection. A new game field can then be constructed and previewed on the game display.

(Doc. 25-1, p. 2.) Thus, the processor "test[s] the field for compliance with at least one of the preceding selections prior to presenting the field to the player. The displayed game field cannot contain a winning combination before play." (*Id.* at 16.)

An expert report by Nick Farley and Associates dated March 7, 2005, is prior art to the '223 Patent. (Doc. 161, ¶ 1.) This report describes the prior art Tic-

---

[5] In considering the instant motion for summary judgment, the court relied on the uncontested facts, or where facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to Plaintiffs, as the nonmoving party. Further, the court considered the facts alleged in the amended complaint regarding the '223 Patent that neither party disputes for purposes of factual background.

Tac-Fruit game as having a "video screen [that] presents nine symbols in a 3x3 array to the player, similar to a t[i]c-tac-toe arrangement." (*Id.* ¶ 2.) Plaintiffs' expert, Kevin Harrigan, Ph.D. ("Dr. Harrigan"), testified that the prior art Tic-Tac-Fruit game disclosed testing and that the processor claimed in the '223 Patent is specially configured to run the Tic-Tac-Fruit game. (Doc. 170, ¶¶ 3–4.) Dr. Harrigan further testified that the invention created by Michael Pace ("Mr. Pace"), the inventor of the Tic-Tac-Fruit game and the '223 Patent, could be implemented using a "conventional, off-the-shelf CPU or microprocessor." (Doc. 161, ¶ 5.) Mr. Pace testified that the "preview" feature was created to work around legal obstacles and that the embodiment of his invention could have been implemented on a game board existing in the 1990s. (*Id.* ¶¶ 8, 10.)

## JURISDICTION

Because this case raises a federal question of patent infringement under 35 U.S.C. § 271, the court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). Further, venue is appropriate under 28 U.S.C. §§ 1391 and 1400(b).

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law."

6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case.'" *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted); *see also* Fed. R.

7

**Appx0103**

Civ. P. 56(c)(4) (establishing requirements for affidavits or declarations filed in support of or opposition to a motion for summary judgment). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). Critically, the court is not required to go on a fishing expedition in search of relevant evidence. The court is only required to consider the evidence that the parties cite in their summary-judgment filings. Fed. R. Civ. P. 56(c)(3).

Summary judgment will generally be appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Appx0104

DISCUSSION

In their motion for summary judgment, Defendants argue that judgment should be granted in their favor on their patent invalidity counterclaim. Specifically, they assert that the court need not revisit *Alice* step one as it already determined that the '223 Patent is directed to the abstract idea of rules for playing a game. (Doc. 162, p. 12.) As to *Alice* step 2, Defendants set forth five arguments: (1) no genuine disputes of material fact preclude entry of summary judgment; (2) generically claimed computer components do not constitute an inventive concept; (3) supposedly new rules for game play do not constitute an inventive concept; (4) there is no fact issue over whether an inventive concept may be found in something unconventional, not routine, or not well-understood; and (5) there is no inventive concept because the '223 Patent claims do not provide a technological solution to a technological problem. (*Id.* at 12–25.) In opposition, Plaintiffs submit that: (1) there are disputed material facts requiring trial; (2) the court should revisit its conclusion as to *Alice* step one; and (3) at *Alice* step two, the "testing" and "automatically displaying" limitations transform the '223 Patent into patent eligible subject matter. The court will address each argument in turn.

**A. Patent Eligibility**

Section 101 provides, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful

9

improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  There are three subject matter categories that are patent ineligible: laws of nature, natural phenomena, and abstract ideas.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

In determining Section 101 eligibility, the court need not "parse each individual claim," rather, analyzing a patent's representative claim is sufficient. *Wolf v. Capstone Photography, Inc.*, No. 2:13-CV-09573, 2014 WL 7639820, at *10 n.3 (C.D. Cal. Oct. 28, 2014) (citations omitted).  Here, the parties agree that claim 44 is representative of the '223 Patent, as they have throughout this litigation.  (Doc. 162, p. 11; Doc. 169, p. 17.)

In *Alice*, the Supreme Court reaffirmed the framework set forth in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts."  *Alice*, 573 U.S. at 217.  The court must first determine "whether the claims at issue are directed to one of those patent-ineligible concepts."  *Id.*  If so, the court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application."  *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78–79.)

Appx0106

### 1.   *Alice* Step One[6]

In the opinion resolving Defendants' motion to dismiss, the court held that "reviewing claim 44 as a whole, the parties' competing characterizations, and comparing claim 44 to claims in previous cases, the court concludes that claim 44 describes the rules for playing a game, and is thus an abstract idea within the meaning of *Alice* step one." (Doc. 61, p. 15.)  Defendants submit it is unnecessary and inappropriate to revisit the court's finding on *Alice* step one based on the law of the case doctrine.  (Doc. 187.)  Defendants argue that Plaintiffs are essentially asking the court to reconsider its ruling, and the time within which to file a motion for reconsideration expired long ago.  (*Id.* at 1.)  According to Defendants, the parties proceeded through fact and expert discovery relying on the court's ruling.  (*Id.* at 1–2.)  Thus, Defendants argue that there are no "extraordinary circumstances" as required by the Supreme Court for a court to revisit it's *Alice* step one holding.  (*Id.* at 1–3.)

Plaintiffs submit that they disagree with the court's prior conclusion on *Alice* step one and can reargue their position at the summary judgment stage.  (Doc. 169,

---

[6] Plaintiffs' counsel identified four new cases during oral argument that the court permitted Defendants to respond to via letter brief.  Defendants aptly point out, *see* Doc. 186, that three of these cases only address *Alice* step one. *EcoServices, LLC v. Certified Aviation Servs., LLC*, 830 F. App'x 634 (Fed. Cir. 2020); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017). Because the court is not persuaded that it should revisit its *Alice* step one ruling, the court will not further consider these three decisions in its analysis.

pp. 18–21.)  They assert that the court should reconsider its conclusion because

"the avoidance of an unjust result outweighs the policy considerations underlying

the law of the case doctrine."  (Doc. 189, p. 1.)  Based on the finite nature of a

patent's property right, *i.e.* a twenty-year term, Plaintiffs argue that an erroneous

and unjust result of finding that a patent abstract is the loss of the inventor's

property right, which even if restored on appeal, cannot make the inventor whole

again.  (*Id.*)

Further, Plaintiffs rely on *EcoServices, LLC v. Certified Aviation Services,*

*LLC*, 830 F. App'x 634 (Fed. Cir. 2020), which was decided on October 8, 2020,

approximately six months after this court's ruling on *Alice* step one.  Plaintiffs

concede that *EcoServices* does not represent supervening new law.  (Doc. 189, p.

3.)  However, Plaintiffs assert that it "represents a further extension of the Federal

Circuit's body of case law on *Alice* Step One."  (*Id.*)  Because *EcoServices* refuted

"the analogy of the claimed process to prior human activity," Plaintiffs' submit that

the court should reevaluate, in the interest of justice, its *Alice* step one

determination since Defendants place such an emphasis on the human activity

argument.  (*Id.* at 2–3.)

The court agrees with Defendants that the law of the case doctrine applies

here.  This doctrine has been developed "to maintain consistency and avoid

reconsideration of matters once decided during the course of a single continuing

12

Appx0108

lawsuit." *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) (citations omitted). While a court has the power to revisit its prior decisions, "courts should be loathe to do so in the absence of extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). Extraordinary circumstances may include newly available evidence, "a supervening new law," when the court needs to clarify or correct an ambiguous ruling, and when the prior ruling may lead to an unjust result. *In re Pharmacy Benefit*, 582 F.3d at 439 (citations omitted).

Here, none of the identified extraordinary circumstances are present. The parties have not presented newly available evidence or new law that would require the court to disturb its *Alice* step one ruling. Further, the court's ruling was not ambiguous and standing by that finding will not lead to an unjust result simply because Plaintiffs disagree with that result. Accordingly, because the court is satisfied that it conducted a full analysis of *Alice* step one in ruling on the motion to dismiss and no extraordinary circumstance justifies revisiting that ruling, it is unnecessary to conduct the *Alice* step one analysis again here. (*See* Doc. 61, pp. 9–15.)

### 2.  *Alice* Step Two

In evaluating *Alice* step two, courts must look for an "inventive concept" by analyzing "the elements of each claim both individually and 'as an ordered

13

combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 78–79). The additional features or elements must ensure "that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Id.* at 221 (quoting *Mayo*, 566 U.S. at 72, 79). Furthermore, the patent-eligible application requires "more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'" *Id.* (quoting *Mayo*, 566 U.S. at 72).

Claim language is the key to evaluating whether a patent contains an inventive concept. *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322 (Fed. Cir. 2017) ("To save a patent at step two, an inventive concept must be evident in the claims.") A patent cannot append "purely conventional steps to an abstract idea [to] supply a sufficiently inventive concept." *In re Smith*, 815 F.3d 816, 819 (Fed. Cir. 2016) (citing *Alice*, 134 S. Ct. at 2357).

Although Defendants set forth numerous specific arguments to show that the '223 Patent fails to contain an inventive concept, Plaintiffs talk past many of Defendants arguments, instead relying on purported factual disputes that preclude summary judgment. But, because the court does not rely on any facts disputed by the parties in holding that the '223 Patent fails to contain an inventive concept, the court need not parse every asserted factual dispute presented by Plaintiffs. Stated

14

**Appx0110**

plainly, there are no material factual disputes that preclude a determination on summary judgment.

### i. Generically claimed computer components

Defendants submit that the '223 Patent claims detail abstract rules of game play, but only some claims identify how these rules are implemented. (Doc. 162, p. 16.)  The "means of implementation," according to Defendants, cannot be the inventive concept because the means are just "general computer tools for carrying out the abstract idea." (*Id.*)  Specifically, one-third of the claims state that the game rules are performed by a "game processor." (*Id.* at 16–17.)  Because of the court's construction of "game processor," Defendants argue that the claims only require a conventional and ordinary computer or processor and there is nothing in the claims or '223 Patent that shows the processor is improved or operates differently. (*Id.*)

Another third of the claims do not specify any means or device for implementing the rules of the game, thus, Defendants submit that this reinforces the genericness of the "game processor" and "program instructions." (Doc. 162, p. 16 n.4.)  As to the final third of the '223 Patent claims, Defendants' argue that the claims "recite that the abstract game rules are carried out by 'program instructions' of a computer readable storage medium of a computer product." (*Id.* at 17.)  Because of the court's construction of "program instructions," these claims

15

Appx0111

cannot include unconventional instructions to convert these claims into an inventive concept. (*Id.* at 17–18.)

Plaintiffs respond by asserting that they have never claimed that generically claimed computer components are an inventive concept. (Doc. 169, p. 22.) Rather, Plaintiffs' "foundational point is that the electronic game processor technology at issue is 'a game processor that is specifically configured for testing the game elements and automatically previewing the feature of a game to be played prior to initiating activation of game play.'" (*Id.* at 22–23.) In support of this argument, Plaintiffs rely on Defendants' expert's statements that new programming could be a technological improvement. (*Id.* at 23.) Further, Plaintiffs submit that whether the embodiment of claim 44 is embedded firmware in the processor or in the EPROM memory device, "the instructions cannot configure the computer unless they are imported to the processor and then executed (and operated upon) by the processor."[7] (*Id.* at 23–24.)

In looking for "something more" to satisfy *Alice* step two, the court cannot rely on the basic use of computers to carry out an already well-known process. *RaceTech, LLC v. Kentucky Downs, LLC*, 167 F. Supp. 3d 853, 864 (W.D. Ky. 2016) (citing *Alice*, 134 S. Ct. at 2358). Nor can generic hardware in combination with a computer system transform an abstract idea into an inventive concept. *Id.*

---

[7] The court notes that Plaintiffs cite no case law in support of their arguments on this point.

These principles are often applied in "the context of computer systems and hardware utilized in conjunction with computer gambling." *Id.* at 864–65 (citing *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1006–07 (Fed. Cir. 2014)).

In *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1006–07 (Fed Cir. 2014), the court reviewed whether two patents reciting "computer aided methods and systems for managing the game of bingo" contained patentable subject matter. At step two of *Alice*, the court detailed certain computer components that enabled the steps of managing a game of bingo and found that the claims at issue did not contain an inventive concept sufficient to transform the abstract idea into patent-eligible subject matter. *Id.* at 1008–09. In doing so, the court found that "the claims recite a program that is used for the generic functions of storing, retrieving, and verifying a chosen set of bingo numbers against a winning set of bingo numbers." *Id.* at 1009.

Similarly, the court in *In re Smith*, 815 F.3d 816, 817 (Fed. Cir. 2016), found the patent at issue titled "Blackjack Variation" did not contain patent-eligible subject matter. The court held that shuffling and dealing a standard deck of playing cards was "purely conventional" and insufficient to transform the abstract idea into an inventive concept. *Id.* at 819. Further, in *NEXRF Corporation v. Playtika Ltd.*, the court found that the abstract idea of "incentivizing gambling tailored to a user's location" did not transform into an inventive concept because it

17

Appx0113

recited "only generic computer hardware performing routine functions—a wireless device, a verification system, a centralized gaming server, and a memory module—to allow a user to play an online slot machine game."  547 F. Supp. 3d 977, 991–92 (D. Nev. 2021).

The '223 Patent is akin to those in *Planet Bingo*, *In re Smith*, *NEXRF Corporation*, and *RaceTech* because it fails to transform computer hardware, tools, and components into the "something more" required for an inventive concept.  The court need not go further than the claims themselves and how this court construed those claims to reach this conclusion.  "Game processor" was construed as "a CPU or microprocessor that executes program instructions to generate a game," while "program instructions" was construed as "conventional commands that can be executed by a computer."  (Docs. 111, pp. 22–27; Doc. 112.)  Evidence outside the '223 Patent further strengthens this holding.  Dr. Harrigan agrees that the Tic-Tac-Fruit game could be implemented using a "conventional, off-the-shelf CPU or microprocessor."  (Doc. 161, ¶ 5.)  And Mr. Pace admits that an embodiment of the '223 Patent could have been implemented on a game board existing in the 1990s.  (*Id.* ¶ 10.)  Thus, these generically claimed computer components cannot transform the abstract idea of rules for playing a game into an inventive concept.

**Appx0114**

### ii.  New rules for game play

Defendants argue that "the only arguable difference between representative claim 44 and the prior art is very narrow, *i.e.*, claim 44 displays the game field to a player 'prior to activation of a game,' not after."  (Doc. 162, pp. 20–21.) According to Defendants, this difference is insufficient for an inventive concept under *Alice* step two because each game step, alone or in combination, is merely an abstract rule of the game.  (*Id.* at 21.)  Defendants submit that novelty of a patent's elements or steps cannot be the inventive concept even if those elements or steps are unconventional.  (*Id.* at 21–22.)

Plaintiffs did not respond to this argument.  Nevertheless, the court agrees with Defendants that regardless of the novelty of the '223 Patent's steps, those steps cannot be the inventive concept.  The "'novelty' of any element or steps in a process, or even of the process itself, is of *no relevance* in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016) (quoting *Diamond v. Diehr*, 450 U.S. 175 (1981)) (emphasis in original).  Accordingly, new abstract rules that are "groundbreaking, innovative, or even brilliant," still cannot be the inventive concept.  *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018) (internal quotations omitted) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013)).

### iii. Unconventional, not routine, or not well-understood

Defendants contend that because the '223 Patent claims do not contain anything "beyond generic computer implementation of abstract game rules, the Court need not consider whether such implementation was well-understood, routine, or conventional." (Doc. 162, p. 22.) Relying on *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018), Defendants submit that "[a]ny suggestion from Plaintiffs that the '223 Patent claim limitations . . . are unconventional because they encompass 'new' electronic games in that they perform the 'preview' step not performed by prior art games, even if true, is irrelevant." (Doc. 162, p. 23.) The claims lack specifics regarding how the game rules are performed, just that the steps are performed. (*Id.*) Thus, Defendants argue that following *BSG Tech*, the court "need not consider whether it was 'well-understood, routine, and conventional' to execute 'preview' with a game processor or program instructions because that execution is simply the use of the ineligible abstract game rules." (*Id.* at 23–24.)

Conversely, Plaintiffs argue that the "automatically displaying" limitation was not well-known, routine and conventional when the '223 Patent was invented. (Doc. 169, p. 21.) Relying on expert reports and testimony, Plaintiffs submit that the "automatically displaying" limitation was "counter-intuitive and not well-known, routine and conventional." (*Id.* at 21–22.) This evidence alone, according

to Plaintiffs, requires denial of summary judgment. (*Id.* at 22.) Lastly, Plaintiffs argue that relying on *BSG Tech* is unhelpful because "the two limitations at issue here in the context of configuring a game processor, unlike the limitations in *BSG Tech*, simply are not abstract ideas." (*Id.*)

In *BSG Tech*, following argument from the plaintiff that the claims recited unconventional features, the court held that "the relevant inquiry is not whether the claimed invention as a whole is unconventional or non-routine." 899 F.3d at 1290. Rather, at step two, the court searches for an inventive concept "that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Alice*, 134 S.Ct. at 2355). The court recounted what the Supreme Court considered in *Alice*, stating:

> Critically, the Court did not consider whether it was well-understood, routine, and conventional to execute the claimed intermediated settlement method on a generic computer. Instead, the Court only assessed whether the claim limitations other than the invention's use of the ineligible concept to which it was directed were well-understood, routine and conventional.

*Id.* (citing *Alice*, 134 S. Ct. at 2359–60). The court ultimately held that the patent's alleged unconventional feature was simply a restatement of what the court already determined to be an abstract idea, thus, the patent lacked an inventive concept. *Id.* at 1291.

In the context of gaming patents, other courts have found that generic computers using new rules to perform the game tasks is not an inventive concept.

21

*See, e.g.*, *Bot M8 LLC v. Sony Corp. of Am.*, 465 F. Supp. 3d 1013 (N.D. Cal. 2020) (holding that while the patent "may very well be the first time someone put all the recited computer parts into a slot machine," those parts only carry out conventional computer tasks); *Konami Gaming, Inc. v. High 5 Games, LLC*, No. 2:14-cv-01483, 2018 WL 1020120 (D. Nev. Feb. 21, 2018) (finding that the "rules of game play" in a slot machine were patent ineligible because even though the claims disclosed "a different configuration of the displayed symbols in a slot machine game, they [did] not disclose a new game or a new technology directed to the slot game").

Here, even accepting that the "automatically displaying limitation" was unconventional at the time the '223 Patent was issued, that is insufficient to transform the rules of playing a game into an inventive concept. Following the Federal Circuit's guidance in *BSG Tech*, the "automatically displaying" limitation is simply a restatement of the rules of game play, which is an abstract idea. The abstract idea "cannot supply the inventive concept that renders the invention 'significantly more' than the ineligible concept." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 774 (Fed. Cir. 2019) (quoting *BSG Tech*, 899 F.3d at 1290.) This is exactly what Plaintiffs would have this court do. Further, Plaintiffs' attempt to distinguish *BSG Tech* is unavailing as the court would have to revisit its ruling on *Alice* step one, which it has already declined to do.

22

**Appx0118**

### iv. No technological solution to a technological problem

Lastly, Defendants submit that the '223 Patent lacks any suggestion that "the abstract 'preview' step or the game rules as a whole provide any sort of concrete, non-abstract technological advancement, *i.e.*, a technical solution to a technical problem." (Doc. 162, p. 24.) The abstract game rules also cannot provide the required inventive concept to overcome *Alice* step two. (*Id.* at 24–25.) Rather, the '223 Patent desires to avoid certain gambling laws by creating games of "skill," not "chance." (*Id.* at 25.) Defendants assert that the inventor of the '223 Patent and Plaintiffs' expert confirmed that the "preview" step was created to work-around legal obstacles in the electronic gaming industry. (*Id.*) Thus, Defendants argue that this is further evidence that the "preview" feature is not an inventive concept. (*Id.*)

Again, Plaintiffs failed to respond to this argument in their brief.[8] Regardless, the court finds Defendants' argument persuasive. Finding a way to side-step gambling laws is not a technological advancement, which requires effecting "an improvement in any other technology or technical field." *See Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016) (quoting *Alice*, 134 S. Ct. at 2359).

---

[8] During oral argument, Plaintiffs presented *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014), which arguably is responsive. However, the court found the patent at issue in *DDR Holdings* to be patent eligible because the invention provided a solution to a technological problem. *Id.* at 1257. That is not the case here.

Accordingly, the court does not find that claim 44 of the '223 Patent individually, or in an ordered combination, transforms the abstract rules for game play into an inventive concept as required by *Alice* step two.

## CONCLUSION

For the reasons stated herein, the court will grant Defendants' motion for summary judgment.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: September 19, 2022

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAVVY DOG SYSTEMS, LLC and POM OF PENNSYLVANIA, LLC, | : | Civil No. 3:19-CV-01470 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA COIN, LLC and PA COIN HOLDINGS, LLC, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## ORDER

**AND NOW**, on this 19th day of September, 2022, in accordance with the accompanying memorandum and the court's April 1, 2022, order, Doc. 180, **IT IS ORDERED AS FOLLOWS**:

1) Defendants' motion for summary judgment, Doc. 155, is **GRANTED**.

2) Judgment shall be entered in favor of Defendants on Count I of the amended complaint.

3) Judgement shall be entered in favor of Defendants on counterclaim Counts I and II.

4) Defendants' motion to exclude opinions and testimony of Kevin Harrigan, Ph.D., Doc. 156, is **DENIED AS MOOT**.

5) The Clerk of Court shall enter judgment and close this case.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

**Appx0121**

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court

**MIDDLE DISTRICT OF PENNSYLVANIA**
**JUDGMENT IN A CIVIL CASE**

| | |
|---|---|
| SAVVY Dog Systems, LLC and<br>POM of Pennsylvania. LLC;<br>    Plaintiffs/Counterclaim Defendants | Case No: 3:19-CV-1470 |
| V. | |
| Pennsylvania Coin, LLC;<br>PA Coin Holdings, LLC<br>    Defendants/Counterclaim Plaintiff | Judge Jennifer P. Wilson |

☐    **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

X    **Decision by Court.** This action came to trial or hearing before the court. The issues have been tried or heard and a decision has been rendered.

        **IT IS ORDERED AND ADJUDGED** that summary judgment be and is hereby entered in favor of the Defendants, **Pennsylvania Coin, LLC and PA Coin Holdings, LLC**, and against the Plaintiffs, **SAVVY Dog Systems, LLC and POM of Pennsylvania. LLC** on Count I of the amended complaint and counterclaim Counts I and II.

**Date:** September 19, 2022       **Peter Welsh, Clerk of Court**

                                          /s/ Mark J. Armbruster
                                             Deputy Clerk

**Appx0122**



US007736223B2

(12) **United States Patent**
Pace

(10) **Patent No.:**　　**US 7,736,223 B2**
(45) **Date of Patent:**　　**Jun. 15, 2010**

(54) **ELECTRONIC GAMING METHOD AND SYSTEM HAVING PREVIEW SCREEN**

(75) Inventor: **Michael R. Pace**, 735 Champions Club Dr., Alpharetta, GA (US) 30004

(73) Assignee: **Michael R. Pace**, Alpharetta, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 579 days.

(21) Appl. No.: **11/428,026**

(22) Filed: **Jun. 30, 2006**

(65) **Prior Publication Data**

US 2007/0232384 A1　　　Oct. 4, 2007

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/430,770, filed on May 9, 2006.

(60) Provisional application No. 60/788,363, filed on Mar. 31, 2006.

(51) **Int. Cl.**
*A63F 9/24*　　　(2006.01)
*A63F 13/00*　　　(2006.01)
*G06F 17/00*　　　(2006.01)
*G06F 19/00*　　　(2006.01)

(52) **U.S. Cl.** .............................. **463/19**; 463/16; 463/20; 463/21; 463/22

(58) **Field of Classification Search** ................... 463/16, 463/19–22
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 6,028,604 | A | * | 2/2000 | Matthews et al. | ........... 715/821 |
| 7,040,985 | B2 | * | 5/2006 | Vancura | ....................... 463/20 |
| 2005/0003883 | A1 | * | 1/2005 | Muir et al. | .................... 463/16 |
| 2005/0202385 | A1 | * | 9/2005 | Coward et al. | .......... 434/307 R |

OTHER PUBLICATIONS

Turner, "Tic-Tac-Fruit: An Analysis," Nov. 15, 2004.
Farley, "Report on the Review and Analysis of the Tic-Tac-Fruit Game," Letter to Kurt O. Gearhiser, Esq., Mar. 7, 2005.

* cited by examiner

*Primary Examiner*—John M Hotaling, II
*Assistant Examiner*—Adetokunbo Torimiro
(74) *Attorney, Agent, or Firm*—Womble Carlyle Sandridge & Rice, PLLC

(57) **ABSTRACT**

An electronic gaming method and system with a game preview display. A field of game symbols is presented on the game display to the player as a preview for deciding whether or not to play the displayed game. If the player decides to play the game, the player selects a field element to turn the symbol displayed into a wild symbol. The player's selection of the field element for the wild symbol location is received by the game software which determines and displays each winning combination of symbols that is formed by such wild symbol location selection. A new game field can then be constructed and previewed on the game display.

**75 Claims, 9 Drawing Sheets**





Appx0123

Case: 23-1073 Document: 12 Page: 142 Filed: 01/04/2023



FIG. 1A

Case: 23-1073 Document: 12 Page: 143 Filed: 01/04/2023



FIG. 1B



FIG. 2

Case: 23-1073 Document: 12 Page: 145 Filed: 01/04/2023

| PLAY DENOMINATION (300) | PLAYER RETURN (302) | OPERATOR PROFIT PER PLAY (304) | TOTAL PLAYS (306) | GAME PROVIDER PROFIT (308) | GAME PROVIDER CHARGE PER PLAY (310) | OPERATOR PROFIT PER FILL (312) |
|---|---|---|---|---|---|---|
| 0.25 | 85% | $0.0375 | 200K | 15.6% | $0.00585 | $7,500.00 |
| 0.50 | 87% | $0.0650 | 140K | 12.9% | $0.00836 | $9,100.00 |
| 0.75 | 89% | $0.0825 | 130K | 10.9% | $0.009 | $10,725.00 |
| 1.00 | 90% | $0.1000 | 120K | 9.75% | $0.00975 | $12,000.00 |
| 2.00 | 92% | $0.1600 | 85K | 8.60% | $0.01376 | $13,600.00 |
| 3.00 | 93% | $0.2100 | 75K | 7.43% | $0.0156 | $15,750.00 |
| 4.00 | 94% | $0.2400 | 75K | 6.50% | $0.0156 | $18,000.00 |
| 5.00 | 95% | $0.2500 | 75K | 6.24% | $0.0156 | $18,750.00 |

FIG. 3

Case: 23-1073   Document: 12   Page: 146   Filed: 01/04/2023

| CRD 400 | VALUE 402 | COUNT 404 | PLAYS 406 | RATE USE% 408 | LEFT 410 |
|---|---|---|---|---|---|
| 1 | $0.25 | 200,000 | 0 | 0.0000% | 199,982 |
| 2 | $0.50 | 140,000 | 2 | 0.0014% | 139,988 |
| 3 | $0.75 | 130,000 | 0 | 0.0000% | 129,988 |
| 4 | $1.00 | 120,000 | 1 | 0.0008% | 119,989 |
| 8 | $2.00 | 85,000 | 0 | 0.0000% | 84,992 |
| 12 | $3.00 | 75,000 | 0 | 0.0000% | 74,993 |
| 16 | $4.00 | 75,000 | 5 | 0.0067% | 74,993 |
| 20 | $5.00 | 75,000 | 0 | 0.0000% | 74,993 |
| COLUMN TOTALS | | | 8 | 0.0089% | |

FIG. 4



FIG. 5



FIG. 6

Case: 23-1073    Document: 12    Page: 149    Filed: 01/04/2023



FIG. 7



FIG. 8

US 7,736,223 B2

1

# ELECTRONIC GAMING METHOD AND SYSTEM HAVING PREVIEW SCREEN

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation-in-part of application Ser. No. 11/430,770, filed May 9, 2006, which claims the benefit of Provisional Application No. 60/788,363, filed Mar. 31, 2006.

## BACKGROUND OF THE INVENTION

The present invention is related generally to amusement and entertainment electronic gaming and, more particularly, to a method and system for providing a game preview display to players of an amusement or entertainment electronic game before playing the game.

Amusement and entertainment type electronic games have become very popular with the public and, as their popularity has increased, several states have legalized certain types of gaming but under heavy regulation. For example, the state of Ohio generally prohibits, pursuant to statutes, gambling and the use of any gambling devices. However, skill-based amusement machines are permitted. To qualify as a skill-based amusement machine in Ohio, the outcome of play during the game must be controlled by the person playing the game and not by predetermined odds or random chance controlled by the machine. Some chance can be part of a skill-based amusement game, but skill must be the predominant feature. The play on the machine must involve a task, game, play, contest, competition or tournament in which the player actively participates.

On a Federal level, Congress enacted the Indian Gaming Regulatory Act (IGRA) in 1988 to regulate gaming operations run by Indian tribes on Indian land. The IGRA established three classes of games with a different regulatory scheme for each. Class I gaming is defined as traditional Indian gaming and social gaming for minimal prizes. Regulatory authority over class I gaming is vested exclusively in tribal governments.

Class II gaming is defined as the game of chance commonly known as bingo (whether or not electronic, computer, or other technological aids are used in connection therewith) and if played in the same location as the bingo, pull tabs, punch board, tip jars, instant bingo, and other games similar to bingo. Class II gaming also includes non-banked card games, i.e., games that are played exclusively against other players rather than against the house or a player acting as a bank. The IGRA specifically excludes slot machines or electronic facsimiles of any game of chance from the definition of class II games. Tribes retain their authority to conduct, license, and regulate class II gaming as long as the state in which the Tribe is located permits such gaming for any purpose and the Tribal government adopts a gaming ordinance approved by the National Indian Gaming Commission (NIGC). Tribal governments are responsible for regulating class II gaming with NIGC oversight.

Class III games include any games that are not class I or class II such as slots, video poker, video blackjack, video Keno, etc. that are usually offered in state-regulated casinos.

## SUMMARY OF THE INVENTION

The present invention is directed to a system and method for providing a game preview display to players of an amusement or entertainment electronic game before playing the game. The invention also provides a game structure having a

2

finite number of game plays for each electronic (virtual) cartridge. Each game cartridge can provide a fixed or variable number of game plays as described herein. Variable number of game plays per cartridge are controlled by an action taken by a player before game play begins, such as selecting a denomination of play. The electronic game service provider supplies reloads of virtual game cartridges to the game operator or game distributor when all game plays for all cartridges are depleted.

In one aspect of the invention, an electronic gaming method with a game preview display is provided to a player. A game field is constructed having a plurality of elements on a game display wherein each element is filled by a game symbol from a plurality of available game symbols. The game symbols for each element are automatically determined such that there is no winning combination without player interaction. The field of game symbols is presented on the game display to the player as a preview for deciding whether or not to play the displayed game. If the player decides to play the game, the player selects a field element to turn the symbol displayed into a wild symbol. The player's selection of the field element for the wild symbol location is received by the game software which determines each winning combination of symbols that is formed by such wild symbol location selection. Each winning combination of symbols on the field of game symbols is displayed to the player. A new game field could then be constructed and presented on the game display.

In another aspect of the invention, a system is provided for electronic gaming with a game preview display. A game processor generates an electronic game display on a game terminal with a plurality of options selectable by a player. The game processor includes: (1) a component for constructing a field having a plurality of elements for a game display with each element being filled by a game symbol from a plurality of available game symbols, wherein the game symbols for each element are automatically determined such that there is no winning combination without player interaction; (2) a component for presenting the field of game symbols to the player as a preview for deciding whether or not to play the displayed game; (3) a component for receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection; and (4) a component for displaying each winning combination of symbols on the field of game symbols.

In another aspect of the invention, a computer program product is provided for electronic gaming with a game preview display. The computer program product comprises a computer readable medium having computer readable code embedded therein. The computer readable medium includes: (1) program instructions that construct a field having a plurality of elements for a game display with each element being filled by a game symbol from a plurality of available game symbols, wherein the game symbols for each element are automatically determined such that there is no winning combination without player interaction; (2) program instructions that present the field of game symbols to the player as a preview for deciding whether or not to play the displayed game; (3) program instructions that receive the player's selection of a field element as a location for a wild symbol and determine each winning combination of symbols that is formed by such selection; and (4) program instructions that display each winning combination of symbols on the field of game symbols.

In yet another aspect of the invention, a method, system, and program product for electronic gaming are provided that can be integrated with various types of electronic games. A

US 7,736,223 B2

| 3 | 4 |

game field is constructed having a plurality of elements for a game display wherein each element is filled by a game symbol from a plurality of available game symbols. The field of game symbols is presented on the game display to the player as a preview for deciding whether to play the displayed game. If the player decides to play the displayed game, an outcome is displayed on the game display.

## BRIEF DESCRIPTION OF THE DRAWINGS

These and other advantages and aspects of the present invention will become apparent and more readily appreciated from the following detailed description of the invention taken in conjunction with the accompanying drawings, as follows.

FIGS. 1A-1B illustrate electronic game displays for a skill-based game in which the present invention can be implemented.

FIG. 2 illustrates processing logic for determining the remaining number of plays of an electronic game that are available at different denominations of play in an exemplary embodiment of the invention.

FIG. 3 illustrates an exemplary payout scheme for varying denominations of play in an exemplary embodiment.

FIG. 4 illustrates game terminal status receipts available to the operator of electronic games in the "plays level" exemplary embodiment.

FIG. 5 illustrates the processing logic for controlling a total number of plays of an electronic game based on a player's action taken prior to selecting a displayed game field element to change to a wild symbol in an exemplary embodiment.

FIG. 6 illustrates the processing logic for an exemplary embodiment of the invention having a game preview display.

FIG. 7 illustrates an exemplary game display having a preview screen displayed adjacent to the current game display.

FIG. 8 illustrates the processing logic for another exemplary embodiment of the invention having a game preview display.

## DETAILED DESCRIPTION OF THE INVENTION

The following description of the invention is provided as an enabling teaching of the invention and its best, currently known embodiment. Those skilled in the relevant art will recognize that many changes can be made to the embodiments described, while still obtaining the beneficial results of the present invention. It will also be apparent that some of the desired benefits of the present invention can be obtained by selecting some of the features of the present invention without utilizing other features. Accordingly, those who work in the art will recognize that many modifications and adaptations to the present invention are possible and may even be desirable in certain circumstances, and are a part of the present invention. Thus, the following description is provided as illustrative of the principles of the present invention and not in limitation thereof, since the scope of the present invention is defined by the claims.

The present invention will be described in the context of the Tic-Tac Fruit electronic skill-based amusement game developed and licensed by Pace-O-Matic, Inc. Tic-Tac Fruit is a game loosely derived from tic-tac-toe that uses player skill to solve a puzzle. The similarity to tic-tac-toe extends from the use of a field or grid of nine spots or tiles arranged in a three by three array. On each play of the electronic game, the game software program constructs a puzzle or task for the player to solve. The electronic game always incorporates at least one correct solution and sometimes generates alternative solutions that may not provide the same prize as the best solution.

The Tic-Tac-Fruit electronic game is a single player game. The player is presented a field completely filled with apparently random symbols selected from a set of nine symbols that includes a "wild" symbol. The "wild" symbol can represent any of the other symbols in the set of game symbols. The "wild" symbol is identical in concept to the "wild card" in card games. The player chooses the displayed symbol in the field to become the "wild" symbol and the symbol(s) that it represents becomes the symbol necessary to complete a winning line(s). The game constructs the field so that the initial field does not place three of the same symbols in a row wherein a row is interpreted as being oriented horizontally, vertically, or diagonally. The field constructed does not include the "wild" symbol. With a three by three field, there are eight possible lines: three horizontal lines, three vertical lines, and two diagonal lines. The player gets a choice of replacing one of the initial nine spots or tiles with the "wild" symbol. The game's construction of the field guarantees that at least one line may be formed by placing the wild symbol selection in the proper spot. On average, two lines may be formed if the optimal spot for the "wild" symbol is selected. However, there is always the possibility that at least one line can be formed.

The player's skills enters into play as the player is given a short period of time in which to choose the "wild" symbol location. Since some symbols are more valuable than others and some locations for the wild symbol may complete multiple lines, a player must quickly examine all nine locations and determine the optimal location for the wild symbol. Once the player selects a location, the game converts the symbol displayed in the element to a wild symbol and examines the field of elements for complete lines and awards points accordingly.

Since there are eight symbols and nine spots on the field, the total number of combinations is approximately 134 million. However, since a field cannot have any initial complete lines, the total number of initial combinations is reduced to approximately 118 million. Valid fields are determined by using an embedded computer processor to iterate through and test each combination to determine if it has any complete lines. If any lines are complete, the combination is not counted or used. The game software determines all of the initial "no-line" fields and tests each of these for potential winners where all fields that can potentially complete a line are counted. Since there are over 100 million compliant field combinations, the player must examine each lineup and symbol values to determine the best location for selecting the wild symbol on the field displayed.

The Tic-Tac-Fruit electronic game does not pick random fields until testing indicates that one is acceptable. Instead, the field is constructed to meet certain criteria. The steps involved in constructing a field in this electronic game are as follows:

1. chose the number of winning lines (i.e., 1, 2, 3, 4);
2. chose the orientation of each of the winning lines (i.e., horizontal, vertical, or diagonal);
3. chose the symbols for each of the lines (i.e., cherries, plums, bells, etc.);
4. fill in empty spots with random symbols; and
5. test the complete field for compliance with the goals set by steps 1 and 3 and repeat the construction process if compliance fails.

One variation of the Tic-Tac-Fruit electronic game presents a game theme that is based primarily on fruit symbols. There are eight symbols and therefore eight different winning com-

US 7,736,223 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

binations. An exemplary touch screen display for this game is illustrated in FIG. 1A. The different symbols that can be displayed are shown in the left column of the display. The player selects a denomination for the next play of the game from among the denominations available on the bottom of the display. In this example, the player has selected $0.75. The game grid depicted does not show any complete lines. Once the player selects the "Play" icon, he must decide which element on the display grid to select as the location of the wild symbol. As illustrated in FIG. 1B, the player selected the space in the upper right corner of the display grid which resulted in the simultaneous completion of two lines, i.e., a horizontal line and a diagonal line.

An exemplary award schedule for this version of the Tic-Tac-Fruit electronic game is provided in Table 1. The column headings represent denominations of play. In other words, the column headings represent the amount that the player can select for each play. The higher the denomination selected, the greater the potential winnings for each of the winning combinations. For example, if the player selects fifty cents as the denomination for the next play of the electronic game, and completes a line with three titanium symbols, he will win the equivalent of $250.00 in points. Had he successfully played the same game with a $4.00 denomination of play, his winnings would have been the equivalent of $2,000.00 in points. Likewise, if the player had selected a denomination of $2.00 and made a location selection for the wild symbol that simultaneously completed a line of three bells and a line of three plums, his winnings would have been the equivalent of $14.00 in points, $10.00 for the line of three bells and $4.00 for the line of three plums. The prizes marked with an asterisk are progressive value prizes. The value awarded for these prizes will increase with every game played.

TABLE 1

| Tic-Tac-Fruit (Classic) | | | |
| Symbol/Denomination | 50¢ | $1.00 | $2.00 | $4.00 |
| --- | --- | --- | --- | --- |
| 3 Titanium | $250* | $500* | $1,000* | $2,000* |
| 3 Spinner | 80¢ | $1.60* | $3.20* | $6.40* |
| 3 Flip | * | * | * | * |
| 3 Bell | $2.50 | $3 | $10 | $20 |
| 3 Plum | $1 | $2 | $4 | $8 |
| 3 Orange | 8¢ | 16¢ | 32¢ | 64¢ |
| 3 Lemon | 4¢ | 8¢ | 16¢ | 32¢ |
| 3 Cherry | 2¢ | 4¢ | 8¢ | 16¢ |

In game operation, a player inserts money into the Tic-Tac-Fruit electronic game device through a bill acceptor located on the front of the electronic game cabinet or console beneath the button panel. The bill acceptor accepts U.S. notes of varying denominations. Bills inserted are displayed on the video screen as points available for game play. The player selects the denomination of play by touching the appropriate icon for the price of game play. A player may change the desired denomination at any time prior to engaging in game play.

Game play begins with the player touching the "Play" icon on the video screen or pressing the "Play/Credit" button on the cabinet exterior. The video screen presents nine symbols in a three by three array to the player as discussed above. The object of the game is for the player to recognize the most rewarding game outcome and to select the appropriate element (i.e., field location) to change from the displayed symbol to a wild symbol in order to obtain the most valuable prize available for the displayed field.

As described above, the initial nine symbols displayed will not present an automatic winning combination. The player must engage in the selection of the field element to be replaced with a "wild" symbol in order to obtain a winning game outcome. The player has a finite length of time in which to select the appropriate field element to replace with the "wild" symbol. Failure to select a field element location for the wild symbol in the allotted time will result in a losing game outcome. In such an instance, the amount that would have been won is revealed to the player and placed into the "bonus pool" that will be won by the player successfully obtaining the top prize. Likewise, if a player selects a field element to replace with a wild symbol that does not obtain a winning outcome, or the best possible winning outcome, the amount that was not won is added to the bonus pool. In the case of the player not obtaining the best possible outcome, the difference between the prize won and the best possible prize is added to the bonus pool.

Essentially, the Tic-Tac-Fruit electronic game presents a task whereby the player must select the appropriate field element to replace with a wild symbol in an effort to obtain the highest value game outcome offered by the device. The prize is determined by a random selection from a finite pool of available prizes. The device selects the quantity of lines that will present a winning outcome. Prizes may be presented on one, two, three, or four lines in a single game play. The device selects the level of prize(s) to be awarded. A software algorithm assesses the arrangement of the prize(s) to be offered to assure that no other, more valuable prizes will inadvertently be presented. The key symbol needed to obtain the highest value prize is replaced with a non-winning symbol prior to display to the player.

The player may redeem accumulated credits after game play. Redemption of the credits is accomplished simply by pressing the "Ticket" button or touching the "Redeem" icon on the video screen. All accumulated credits will be redeemed as a cash voucher on a printed ticket. The printed ticket can be presented to a redemption counter within the venue for cash payment.

The Tic-Tac-Fruit game possesses a finite number of plays. The game is configured with electronic cartridges that contain a finite pool of game plays based upon eight different levels of winning prize values. The electronic cartridges are not accessible to the operator of the machine and cannot be changed. When the current allotment of finite game plays in one cartridge is depleted, the next cartridge is automatically selected by the device. When all of the electronic cartridges are depleted, the device will become disabled with a message stating "out of plays" on the lower center of the video screen. The device operator must purchase additional pools of game plays, which will be enabled with the correct entry of an eight digit pass code provided by the electronic game provider. Configuration of game play for a specific machine can only be done by software programming.

The quantity of game plays is also game theme specific, i.e., it varies based on the particular version of the Tic-Tac-Fruit electronic game that is placed in a venue. For the one described herein, there are three electronic cartridges provided with the game, with thirty-thousand plays per electronic cartridge for a total number of ninety thousand game play. The particular number of game plays for each version of the Tic-Tac-Fruit game are purchased by a device operator. The operator pays a flat licensing fee in order to obtain an eight digit pass code that must be correctly entered in order to enable the appropriate quantity of game plays for the various game themes.

Appx0135

US 7,736,223 B2

7

Each purchase level of each game theme is merely a multiple of a lowest game purchase level. Therefore, all game outcomes are derived from the same finite pool of game outcomes, regardless of purchase amount. Each time the player engages play, an outcome is selected at random from the finite pool of game outcomes. The manner in which the player plays the game determines whether the player will receive the winnings or if the winnings will go into the bonus pool, which will be awarded to the next player successfully obtaining the top prize.

By using the concept of a virtual cartridge to reload an electronic game console for plays, the electronic game service provider has been limited to a licensing fee for the game software which permits a finite number of plays, i.e., 30,000 per virtual cartridge, 90,000 total plays in the case of the Tic-Tac-Fruit game used as an example herein. In this system, the operator of the game receives 90,000 plays regardless of the denominations selected for play by the game players. The electronic game in an exemplary embodiment provides the player with four different play levels, e.g., $0.50, $1.00, $2.00 and $4.00. The operator can have the game console provide other denominations of play instead. If a player played the electronic game at the $0.50 level and uses all 90,000 plays available, the operator is going to make far less in profit than if the players had selected the $4.00 level for all plays. From the electronic game service provider's perspective charging a flat fee for the virtual cartridges, if all the games are played at the lowest denomination, the game operator may not make sufficient profit to make keeping the game console installed at the operator's location worthwhile. On the other hand, the flat fee charged may result in too small a profit for the electronic game service provider. Under current laws, the game provider does not have the option of charging the operator a fixed percentage of his profits for leasing the electronic game and software. Playing an electronic game with a finite structure (i.e., fixed number of plays) having a "jackpot" for each virtual cartridge provides the operator with access to information on the number of plays still remaining. The game operator could take advantage of this information to play the remaining games at the highest denomination to win the jackpot amount.

In an exemplary embodiment of the invention, a finite structure is provided for each denomination of play. The electronic game service provider still charges a flat licensing fee for each reload of the virtual cartridges. However, instead of a having a fixed number of plays available per load of the virtual cartridges, the number of plays available are based on the denominations that are available for player selection and are dynamically updated during operation of the game plays based on the actual denominations used by the players in actual game play on the electronic game console as described more fully below. For example, if all games are played at a $0.25 level, the operator could get 200,000 plays per load. If all games are played at a $5.00 level, the operator could get 75,000 plays per load. Since each game will be played multiple times at each possible denomination, the number of games remaining at each denomination is determined dynamically after each play. Note that in the context of this invention, denomination of play and level of play are used interchangeably.

FIG. 2 illustrates processing logic for determining the remaining number of plays of an electronic game that are available at different denominations (i.e., levels) of play in an exemplary embodiment. The first few steps of the processing logic are performed before activation of the electronic game at the operator's venue with a "fill" or load of game plays. The electronic game service provider first determines the flat fee

8

to be charged for the load of game plays as indicated in step **200**. A plurality of denominations for play of the electronic game is selected as indicated in step **202**. The denominations for an electronic game terminal can be preset by the electronic game service provider and changed by the operator. The electronic game service provider determines a maximum number of games that can be played at each of the plurality of denominations as indicated in step **204**. This determination is made for each possible denomination of play although only four denominations are initially selected in the embodiment used for the Tic-Tac-Fruit game. The electronic game service provider provides a passcode that is generated from the terminal identifier to the operator. The operator then enters the passcode to activate game play as indicated in step **206**. The electronic game software determines the denomination of play selected by the player in step **208**. After each play of the game, the game software dynamically determines the number of games remaining to be played at each denomination of play as indicated in step **210**. The number determined for each denomination of play reflects the number of games that could be played at the particular level of play.

After determining the number of plays remaining at each denomination, the game software determines if there are remaining games to be played as indicated in decision step **212**. If there are games remaining to be played, the software returns to process step **208** for the next play of the game. If there are no games remaining to be played, the electronic game displays an "out of plays" message on the electronic game display as indicated in step **214**. Next, in decision step **216**, a determination is made as to whether the operator has requested a reload of game plays. Unless the operator requests a refill of the virtual game cartridge, the electronic game terminal remains inoperative as indicated in step **230**. The operator requests a refill of game plays by sending the terminal identifier to the electronic game service provider in order to obtain a new passcode to reactivate the electronic game. The processing logic then returns to step **208** to wait for the next play of the electronic game.

Upon receiving the operator request for a refill of game plays (step **218**), the electronic game service provider generates a new passcode for reloading the electronic game terminal that is based on the terminal identifier as indicated in step **220**. The electronic game terminal is reactivated for play by entering the passcode into the terminal as indicated in step **222**.

FIG. 3 illustrates an exemplary payout scheme for varying denominations of play in an exemplary embodiment. For the Tic-Tac-Fruit game used as an example herein, the electronic game service provider enables the operator to select four denominations for play. The first column **300** depicts the play denominations that can be selected. The second column **302** shows how much of the game play amount is returned to the player on average at each possible play denomination. The operator's profit per each game played at a particular denomination is shown in the third column **304** The total number of plays available at each denomination, if all game plays were made at a single denomination, is shown in the fourth column **306**. As can be seen, the total number of plays available for each denomination per load varies non-linearly from 200K at the $0.25 level of play to 75K at the $3.00, $4.00 and $5.00 levels of play. The total number of games per load will vary based on actual denominations selected by the players. The electronic game service provider's profits at each denomination of play is shown in the fifth column **308**. The percentage shown is expressed as a percentage of the operator's per game profit. For example, the electronic game service provider's profit per play at the $4.00 level of play is $0.0156 which is

US 7,736,223 B2

9

6.5% of the operator's corresponding profit of $0.21 per play. It should be noticed that in this example, the game provider profit per play is variable and non-linear based on the different denominations. The next column **310** indicates the equivalent amount that the game provider would have to "charge per each play" at each denomination to reach the flat fee that is actually charged per load. In other words, the electronic game service provider charges a flat fee per load of the virtual cartridges. If all the games were played at a particular denomination, e.g. $1.00, the total number of games played allowed by the game software control would be 120K and the equivalent game provider charge per play at this level would be $0.00975. The last column indicates the operator's total profit per fill of the virtual cartridge if all games were played at the particular denomination. For example, if all games were played at the $0.25 level, the operator would make a total profit of $7500 taking into consideration the percentage amount returned to game players. If all games were played at the $5.00 level, the operator's profit per fill would be $18,750.00.

FIG. **4** illustrates game terminal status receipts available to the operator of electronic games in the "plays level" exemplary embodiment. In FIG. **4**, the first column **400** labeled "CRD" represents multiples of the lowest denomination game play ($0.25 in this example). The second column **402** labeled "Value" indicates the denomination of play, ranging from $0.25 to $5.00. The third column **404** labeled "Count" represents the number of plays available at a particular denomination, if all games were played at the same level. The fourth column **406** labeled "Plays" indicates the number of games played at the corresponding levels in the "Value" column. In this sample terminal status receipt, two games have been played at the $0.50 level, one game at the $1.00 level and two games at the $4.00 level. The column total shows that eight games have been played on this game terminal. The next column **408** labeled "Rate-Use %" indicates the percentage of games that have been played at the corresponding play level. For example, 0.0067% of the available games at the $4.00 level per virtual cartridge load have been played. The final column **410** labeled "Left" indicates the remaining number of games available at a particular pay level as game play proceeds. The numbers in this column are determined dynamically after each game play. After the first eight game plays, there are 74,993 games remaining at the $3.00, $4.00 or $5.00 levels. The numbers in this column take into consideration each previous play of the electronic game and the denomination at which each game was played.

FIG. **5** illustrates the processing logic for controlling a total number of plays of an electronic game based on a player's action taken prior to selecting a displayed game field element to change to a wild symbol in an exemplary embodiment. Processing begins, as indicated in step **500**, with the construction of a field of elements for a game display wherein each element is filled by a game symbol from the game symbols available. The underlying software algorithms follow several rules of game field construction before displaying the field to the player. These rules include selecting a number of winning combinations for a play of the game; selecting the orientation of each winning combination on the game grid; selecting the symbols for each winning combination; randomly selecting symbols for the remaining elements of the game grid; and testing the field for compliance with at least one of the preceding selections prior to presenting the field to the player. The displayed game field cannot contain a winning combination before play. The field is presented to the player in step **502**.

10

One the constructed field is displayed to the player, the player has a finite time in which to make a decision regarding the element in the displayed field to select for the wild symbol. If the player fails to make a selection, the game times out (step **504**). Otherwise, the player makes a selection of a wild symbol location in the displayed field in decision step **506**. The game software receives and processes the player's selection of a wild symbol location in step **508**. The game software determines the winning combinations of symbols in step **510**, and displays the winning combinations to the player in step **512**. The game software automatically determines the total number of plays of the game based on the player's action before commencing the game play in step **514**. In an exemplary embodiment, such action can be the player's selection of a denomination of play. When the player selects a higher denomination of play, the number of remaining games available decreases at a faster rate than if a lower denomination of play is selected. Consequently, the total number of game plays are controlled by each such player action. In decision step **516**, the player can opt to play again or end game play (step **520**).

FIG. **6** illustrates the processing logic for an exemplary embodiment having a game preview display. Processing begins, as indicated in step **600**, with the construction of a field of elements for a game display wherein each element is filled by a game symbol from the game symbols available. As described above, underlying software algorithms follow several rules of game field construction before displaying the field to the player. These rules include selecting a number of winning combinations for a play of the game; selecting the orientation of each winning combination on the game grid; selecting the symbols for each winning combination; randomly selecting symbols for the remaining elements of the game grid; and testing the field for compliance with at least one of the preceding selections prior to presenting the field to the player. The displayed game field cannot contain a winning combination before play. The field is presented to the player on the game display as a preview of the game in step **602**. In one embodiment, the player can select from a plurality of game preview displays, with each game preview being associated with a different play level. Any potential player can observe the game display for as long as desired before making a decision to play the displayed game in decision step **604**. The electronic game software remains in a wait state until a player decides to play the displayed game as indicated in step **606**. The electronic game receives a player's selection of a play level (i.e., denomination of play) and activates the game when the "Play" button is touched as indicated in step **608**.

Once the electronic game is activated for play, the player must decide which element to change to the wild symbol on the touch screen as indicated in decision step **610**. If the player fails to select an element to change to the wild symbol within a predetermined amount of time, the game times out as indicated in step **612** and the player loses an amount that is equal to the level of play (e.g., if the player selected $4.00 as the level of play for the game, this amount will be deducted from any remaining balance the player may have). The game software receives the player's selection of the wild symbol as indicated in step **614**. The game software processes the player's selection of a wild symbol location and determines the winning combinations of symbols and corresponding payout in step **616**. The game software also displays the winning combinations to the player in this step. The game software can then construct and display a new game field as indicated in step **618**. The game display is constructed using the same rules described herein. Referring to FIGS. **1A-1B**, the player can select the "Next Puzzle" or similarly labeled buttons to

US 7,736,223 B2

11

preview the next game. By selecting the play level (i.e., denomination of play), the player can preview the next game at the selected play level. The player can preview the next game at each play level before choosing the game to play. The game software then waits for the current player to decide whether or not to play the new game displayed as indicated in decision step **620**. Selecting play will return processing logic to step **610** where the game waits for a selection of an element to change to the wild symbol. If the player chooses not to play the new game displayed in decision step **620**, the player redeems the payout won and any credit balance that the player may have as indicated in step **630**. From step **630**, processing logic returns to step **606** to wait for a new player.

The preview screen of the present invention can be used in various additional embodiments. These additional embodiments can be implemented without the use of a wild symbol. In the context of the electronic game having an array of symbols as described herein, the game preview screen can be constructed and displayed without the need for a player to do anything other than to select "Play." In this case, the preview screen could actually be the results screen, displaying the game outcome. Such a preview screen could display a winning or a non-winning combination. The player would play the displayed game knowing the outcome in order to have the electronic gaming system provide the next game preview display.

A preview of the next game could be displayed adjacent to the current preview screen. In order to get to the next game, the player would have to play the currently previewed game. An example of such a game display is depicted in FIG. **7** in which the current game is previewed on the main portion of the display and the next game (e.g., at the same play level or denomination) is displayed adjacent to the current game display in the upper right portion of the display. The exact location of the adjacent game preview is not important, but the smaller game preview on the display device must have sufficient resolution to provide a clear, unambiguous preview of the next game. After the player plays the game displayed in the main portion of the display, the previously displayed smaller game preview will be displayed on the main portion of the display and a new game preview will be displayed adjacent to the main display.

The preview display could also be implemented in other forms of electronic or electromechanical games. For example, it could be used in the context of an electronic or electromechanical slot machine having a plurality of spinning reels (actual or simulated) and displaying one or more lines of symbols. The displayed game could actually be the result which may or may not be a winning combination of symbols. The player would play the displayed game, knowing its result, in order to preview the next game. The preview screen could also be implemented in an electronic game having a plurality of reels, each reel having a plurality of symbols, and a nudge feature and/or wild symbol. The game display could have a next game preview positioned in a space adjacent or in proximity to the main game display. A nudge game is one in which the player has an option to nudge one of the reels up or down one or more positions after the reels stop spinning in order to achieve a winning combination, usually along a pay line associated with the plurality of reels.

FIG. **8** illustrates the processing logic for other exemplary embodiments of the invention having a game preview display. The logic is a subset of the processing logic illustrated in FIG. **6** in which player interaction is required in order to play the displayed game. Processing begins as indicated in step **800** with the construction of a field for the game display. Depending on the specific game, the field can be constructed in

12

various ways that are known to those skilled in the art. The field is then displayed to the player on the game display as indicated in step **802**. The game displayed may contain a winning combination on a single or multiple lines depending on the type of game. The player can observe the displayed game for any length of time before deciding whether or not to play the displayed game in decision step **804**, in order to advance to the next game preview display. If the result of the play of the game is a winning combination, the game software determines the winnings and displays the winning outcome to the player, as indicated in step **808**. The player can then select "Preview" or "Next Puzzle" to have the next game displayed, or the next game already could be displayed adjacent to the current game display. This is indicated in step **810**. The game software remains in a wait state until a player decides to play the displayed game as indicated in decision step **812**. Selecting play will return processing logic to step **808**. If the player chooses not to play the new game in decision step **812**, the player redeems the payout won and any credit balance that the player may have as indicated in step **820**.

The present invention of an electronic game in its various embodiments has been described as a combination of hardware and software components. It is important to note, however, that those skilled in the art will appreciate that the software of the present invention is capable of being distributed as a program product in a variety of forms, and that the present invention applies regardless of the particular type of signal bearing media utilized to carry out the distribution. Examples of signal bearing media include, without limitation, recordable-type media such as diskettes or CD ROMs, and transmission type media such as analog or digital communications links.

The corresponding structures, materials, acts, and equivalents of all means plus function elements in any claims below are intended to include any structure, material, or acts for performing the function in combination with other claim elements as specifically claimed.

Those skilled in the art will appreciate that many modifications to the exemplary embodiment are possible without departing from the spirit and scope of the present invention. In addition, it is possible to use some of the features of the present invention without the corresponding use of the other features. Accordingly, the foregoing description of the exemplary embodiment is provided for the purpose of illustrating the principles of the present invention and not in limitation thereof since the scope of the present invention is defined solely by the appended claims.

What is claimed is:

1. An electronic gaming method comprising the steps of:

constructing a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen display to a player prior to initiating activation of game play;

**13**

receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection; and

displaying each winning combination of symbols on the touch screen display.

2. The electronic gaming method of claim 1 further comprising the steps of receiving the player's selection of a play level and activating game play.

3. The electronic gaming method of claim 1 further comprising the step of determining if the player has decided to play the game field displayed on the game display.

4. The electronic gaming method of claim 3 further comprising the step of redeeming a player's credit balance and an associated payout for each winning combination of symbols on each game previously played.

5. The electronic gaming method of claim 1 wherein the constructed field is a two-dimensional array having a plurality of rows and columns.

6. The electronic gaming method of claim 1 wherein the step of constructing the field comprises:

determining an orientation of each winning combination for the play of the game;

determining the symbols for each of the winning combinations; and

randomly determining symbols for the remaining elements of the field.

7. The electronic gaming method of claim 6 wherein the orientation of each winning combination is horizontal, vertical or diagonal.

8. The electronic gaming method of claim 1, further comprising the steps of:

constructing a plurality of game fields each having a plurality of game symbols, with each game field corresponding to a selectable level of play; and

automatically displaying each of the plurality of game fields on the touch screen game display sequentially for each selectable level of play, wherein the player's selection of the level of play determines which of the sequentially displayed games is actually played.

9. The electronic gaming method of claim 8 further comprising receiving the player's selection of a sequentially displayed game to play.

10. The electronic gaming method of claim 1 wherein each winning combination of symbols has an associated payout to the player.

11. The electronic gaming method of claim 1 wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game.

12. The electronic gaming method of claim 1 wherein the denomination of play corresponds to the level of play.

13. An electronic gaming system comprising:

an electronic game terminal including a touch screen display;

a game processor for generating an interactive electronic game on the game terminal with a plurality of options selectable by a player, the game processor configured for:

constructing a game field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display;

**14**

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game display prior to initiating activation of game play;

receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection; and

displaying each winning combination of symbols on the touch screen display.

14. The electronic gaming system of claim 13 wherein the game processor is further configured for receiving the player's selection of a play level and activating game play.

15. The electronic gaming system of claim 13 wherein the game processor is further configured for determining if the player has decided to play the game field displayed on the game display.

16. The electronic gaming system of claim 15 wherein the game processor is further configured for redeeming a player's credit balance and an associated payout for each winning combination of symbols on each game previously played.

17. The electronic gaming system of claim 16 wherein the denomination of play corresponds to the level of play.

18. The electronic gaming system of claim 13 wherein the game processor is further configured for constructing the field as a two-dimensional array having a plurality of rows and columns.

19. The electronic gaming system of claim 13 wherein the game processor is further configured for:

determining an orientation of each winning combination for the play of the game;

determining the symbols for each of the winning combinations; and

randomly determining symbols for the remaining elements of the field.

20. The electronic gaming system of claim 19 wherein the orientation of each winning combination is horizontal, vertical or diagonal.

21. The electronic gaming system of claim 13 wherein each winning combination of symbols has an associated payout to the player.

22. The electronic gaming system of claim 13 wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game.

23. The electronic gaming system of claim 13 wherein the game processor is further configured for:

constructing a plurality of game fields each having a plurality of game symbols, with each field corresponding to a selectable level of play; and

automatically displaying each of the plurality of game fields on the touch screen game display sequentially for each selectable level of play, wherein the player's selection of the level of play determines which of the sequentially displayed games is actually played.

24. The electronic gaming system of claim 23 wherein the game processor is further configured for receiving the player's selection of a sequentially displayed game to play.

25. A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded therein, the computer readable storage medium comprising:

program instructions that construct a game field having a plurality of elements for an interactive touch screen

US 7,736,223 B2

15                                                    16

game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display;

program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

program instructions that receive the player's selection of a field element as a location for a wild symbol and determine each winning combination of symbols that is formed by such selection; and

program instructions that display each winning combination of symbols on the touch screen display.

26. The computer program product for electronic gaming of claim 25 further comprising program instructions that receive the player's selection of a play level and activate game play.

27. The computer program product for electronic gaming of claim 25 further comprising program instructions that determine if the player has decided to play the game field displayed on the game display.

28. The computer program product for electronic gaming of claim 27 further comprising program instructions that redeem a player's credit balance and an associated payout for each winning combination of symbols on each game previously played.

29. The computer program product for electronic gaming of claim 25 wherein the field is a two-dimensional array having a plurality of rows and columns.

30. The computer program product for electronic gaming of claim 25 wherein the program instructions that construct the field comprise:

program instructions that determine an orientation of each winning combination for the play of the game;

program instructions that determine the symbols for each of the winning combinations; and

program instructions that randomly determine symbols for the remaining elements of the field.

31. The computer program product for electronic gaming of claim 30 wherein the orientation of each winning combination is horizontal, vertical or diagonal.

32. The computer program product for electronic gaming of claim 25 wherein each winning combination of symbols has an associated payout to the player.

33. The computer program product for electronic gaming of claim 25 wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game.

34. The computer program product for electronic gaming of claim 25 wherein the denomination of play corresponds to the level of play.

35. The computer program product for electronic gaming of claim 25 further comprising:

program instructions that construct a plurality of game fields each having a plurality of game symbols, with each game field corresponding to a selectable level of play; and

program instructions that display each of the plurality of game fields on the touch screen game display sequen-

tially for each selectable level of play, wherein the player's selection of the level of play determines which of the sequentially displayed games is actually played.

36. The computer program product for electronic gaming of claim 35 further comprising program instructions that receive the player's selection of a sequentially displayed game to play.

37. An electronic gaming method comprising the steps of:

constructing a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

determining if the player has decided to play the displayed game; and

displaying an outcome resulting from play of the displayed game.

38. The electronic gaming method of claim 37 further comprising generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game.

39. The electronic gaming method of claim 38 wherein the additional game field is for a next game to be played.

40. The electronic gaming method of claim 37 wherein the displayed game comprises a two-dimensional array of game symbols.

41. The electronic gaming method of claim 37 wherein the displayed game comprises a one-dimensional array of game symbols.

42. The electronic gaming method of claim 37 wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols.

43. The electronic gaming method of claim 42 wherein an outcome of the displayed game can be changed by moving a reel up or down at least one position in order to replace a current symbol on a pay line.

44. An electronic gaming system comprising:

an electronic game terminal including a touch screen display;

a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:

constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

determining if the player has decided to play the displayed game; and

US 7,736,223 B2

17

displaying an outcome resulting from play of the displayed game.

**45**. The electronic gaming system of claim **44** further comprising a component for generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game.

**46**. The electronic gaming system of claim **45** wherein the additional game field is for a next game to be played.

**47**. The electronic gaming system of claim **44** wherein the displayed game comprises a two-dimensional array of game symbols.

**48**. The electronic gaming system of claim **44** wherein the displayed game comprises a one-dimensional array of game symbols.

**49**. The electronic gaming system of claim **44** wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols.

**50**. The electronic gaming system of claim **49** wherein an outcome of the displayed game can be changed by moving a reel up or down at least one position in order to replace a current symbol on a pay line.

**51**. A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded herein, the computer readable storage medium comprising:

program instructions that construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

program instructions that determine at least one winning combination for each play of the game;

program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

program instructions that determine if the player has decided to play the displayed game; and

program instructions that display an outcome resulting from play of the displayed game.

**52**. The computer program product for electronic gaming of claim **51** further comprising program instructions that generate and display an additional game field simultaneously on the game display in proximity to the displayed game.

**53**. The computer program product for electronic gaming of claim **52** wherein the additional game field is for a next game to be played.

**54**. The computer program product for electronic gaming of claim **51** wherein the displayed game comprises a two-dimensional array of game symbols.

**55**. The computer program product for electronic gaming of claim **51** wherein the displayed game comprises a one-dimensional array of game symbols.

**56**. The computer program product for electronic gaming of claim **51** wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols.

**57**. The computer program product for electronic gaming of claim **56** further comprising program instructions that enable a player to move a reel up or down at least one position to replace a current symbol on a pay line and change an outcome of the displayed game.

18

**58**. A method for displaying a plurality of electronic game fields for selection by a player before initiating play of a selected game comprising the steps of:

receiving a signal from the player to generate an interactive electronic game on a touch screen display of an electronic game terminal;

generating a game field having a plurality of elements for the interactive game display wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

receiving a signal from the player to generate another of the plurality of electronic game fields associated with a different level of play prior to initiating activation of game play;

generating and automatically displaying another of the plurality of electronic game fields; and

receiving the player's selection of the electronic game field to play prior to initiating activation of game play.

**59**. The method for displaying a plurality of electronic game fields of claim **58** further comprising generating and displaying a next game field simultaneously on the game display in proximity to a currently displayed game.

**60**. The method for displaying a plurality of electronic game fields of claim **58** wherein the displayed game comprises a two-dimensional array of game symbols.

**61**. The method for displaying a plurality of electronic game fields of claim **58** wherein the displayed game comprises a one-dimensional array of game symbols.

**62**. The method for displaying a plurality of electronic game fields of claim **58** wherein the displayed game comprises a plurality of vertically-oriented reels, each reel having a plurality of game symbols.

**63**. The method for displaying a plurality of electronic game fields of claim **62** wherein an outcome of the displayed game can be changed by moving a reel up or down at least one position in order to replace a current symbol on a pay line.

**64**. A system for displaying a plurality of electronic game fields each associated with a different level of play comprising:

an electronic game terminal including a touch screen display;

a game processor for generating an interactive electronic game display on a game terminal, the game processor configured for displaying a plurality of electronic game fields for selection by a player before initiating play of a selected game by:

receiving a signal from the player to generate an interactive electronic game;

generating a game field having a plurality of elements for the interactive game display wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

US 7,736,223 B2

19

automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

receiving a signal from the player to generate another of the plurality of electronic game fields associated with another level of play prior to initiating activation of game play;

generating and automatically displaying another of the plurality of electronic game fields; and

receiving the player's selection of the electronic game field to play prior to initiating activation of game play.

65. The system for displaying a plurality of electronic game fields of claim 64 further comprising a component for generating and displaying a next game field on the game display simultaneously in proximity to a currently displayed game.

66. The system for displaying a plurality of electronic game fields of claim 64 wherein the displayed game comprises a two-dimensional array of game symbols.

67. The system for displaying a plurality of electronic game fields of claim 64 wherein the displayed game comprises a one-dimensional array of game symbols.

68. The system for displaying a plurality of electronic game fields of claim 64 wherein the displayed game comprises a plurality of vertically-oriented reels, each reel having a plurality of game symbols.

69. The system for displaying a plurality of electronic game fields of claim 68 wherein an outcome of the displayed game can be changed by moving a reel up or down at least one position in order to replace a current symbol on a pay line.

70. A computer program product for displaying a plurality of interactive electronic game fields for selection by a player when executed on a processor, the computer program product comprising a computer readable storage medium having computer readable code embedded therein, the computer readable storage medium comprising:

program instructions that receive a signal from a player to generate interactive electronic game on a touch screen display of an electronic game terminal;

program instructions that generate a game field having a plurality of elements for the interactive game display wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

20

program instructions that determine at least one winning combination for each play of the game;

program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

program instructions that receive a signal from the player to generate another of the plurality of electronic game fields associated with a different level of play prior to initiating activation of game play;

program instructions that generate and automatically display another of the plurality of electronic game fields; and

program instructions that receive the player's selection of the electronic game field to play prior to initiating activation of game play.

71. The computer program product for displaying a plurality of electronic game fields of claim 70 further comprising program instructions that generate and display a next game field on the game display simultaneously in proximity to a currently displayed game.

72. The computer program product for displaying a plurality of electronic game fields of claim 70 wherein the displayed game comprises a two-dimensional array of game symbols.

73. The computer program product for displaying a plurality of electronic game fields of claim 70 wherein the displayed game comprises a one-dimensional array of game symbols.

74. The computer program product for displaying a plurality of electronic game fields of claim 70 wherein the displayed game comprises a plurality of vertically-oriented reels, each reel having a plurality of game symbols.

75. The computer program product for displaying a plurality of electronic game fields of claim 70 further comprising program instructions that enable a player to move a reel up or down at least one position to replace a current symbol on a pay line and change an outcome of the displayed game.

*    *    *    *    *

## CERTIFICATE OF SERVICE

I hereby certify that, on the 4th day of January, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which thereby served a copy upon all counsel of record via email or electronic means.

/s/ Steven G. Hill
Steven G. Hill

## CERTIFICATE OF COMPLIANCE

I, Steven G. Hill, counsel for Appellants Savvy Dog Systems, LLC and POM of Pennsylvania, LLC and a member of the Bar of this Court, certify that the attached Appellants' Opening Brief is proportionately spaced, has a typeface of 14 points or more, and contains 11,521 words.

Dated: January 4, 2023

Respectfully submitted,

/s/ Steven G. Hill
Steven G. Hill
David K. Ludwig
Hill, Kertscher & Wharton, LLP
3625 Cumberland Blvd., Suite 1050
Atlanta, GA 30339
Phone: 770-953-0995
Fax: 770-953-1358
sgh@hkw-law.com
dludwig@hkw-law.com

*Attorneys for Plaintiffs-Appellants Savvy Dog Systems, LLC and POM of Pennsylvania, LLC*